Cyprium Therapeutics, Inc. v Curia Global, Inc. (2022 NY Slip Op 51426(U))

[*1]

Cyprium Therapeutics, Inc. v Curia Global, Inc.

2022 NY Slip Op 51426(U)

Decided on September 12, 2022

Supreme Court, Albany County

Platkin, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on September 12, 2022
Supreme Court, Albany County

Cyprium Therapeutics, Inc., Petitioner,

against
Curia Global, Inc., Respondent.

Index No. 905902-22

DLA Piper LLP (US)
Attorneys for Petitioner
(Brett Ingerman, of counsel)
6225 Smith Avenue
Baltimore, Maryland 21209
and
(Steven M. Rosato, of counsel)
1251 Avenue of the Americas
New York, New York 10020
Nixon Peabody LLP
Attorneys for Respondent
(Daniel J. Hurteau, of counsel)
677 Broadway, 10th Floor
Albany, New York 12207
and
(Richard H. Tilghman IV and Kathleen Mallon, of counsel)
70 W. Madison St., Suite 5200
Chicago, Illinois 60602

Richard M. Platkin, J.

Petitioner Cyprium Therapeutics, Inc. ("Cyprium") brings this special proceeding under [*2]CPLR 7502 (c), seeking a preliminary injunction in aid of arbitration. Respondent Curia Global, Inc. ("Curia") opposes the application and cross-moves for an order compelling arbitration and staying this proceeding.
BACKGROUND
"Cyprium is biotechnology company that develops novel therapies for Menkes disease" (NYSCEF Doc No. 1 ["Petition"], ¶ 36). Menkes disease is "a severe childhood disease that prevents the body from properly metabolizing copper. [It] may affect up to 250 newborns annually in the United States alone and causes serious developmental and neurological symptoms, including significant brain and nervous system damage, lack of normal growth, and severe abnormalities in the child's physiological development" (id., ¶ 6; see generally NYSCEF Doc No. 68 ["Kaler Aff."]). "Infants born with [Menkes] disease, if untreated, presently have a median survival rate of just 16 months. There are currently no FDA approved treatments for this disease" (Petition, ¶ 6).
"Curia is a global contract research, development and manufacturing organization that assists biotechnology companies in the development and manufacturing of drug therapies" (id., ¶ 37). "Curia's predecessor in interest, Integrity Bio, Inc., served as Cyprium's contract manufacturing organization ('CMO') beginning in 2017 out of its Camarillo, California facility (the 'Camarillo Facility')" (id., ¶ 9). Following Curia's acquisition of Integrity Bio, the Camarillo Facility has been operated by Curia Bio California, Inc. ("Curia Bio"), a subsidiary of Curia (see id.; NYSCEF Doc No. 15 ["Parikh Aff."], ¶ 7).
For more than three decades, Stephen G. Kaler, M.D., M.P.H. has been working to treat infants with Menkes disease through the administration of Copper Histidinate (see Kaler Aff., ¶¶ 4-5). The new drug that Cyprium seeks to bring to market, CUTX-101 ("the Product"), is a formulation of Copper Histidinate administered through a daily "subcutaneous injection, . . . for three or more years" (Petition, ¶¶ 1, 7). "Remarkably, Cyprium's clinical studies to date suggest that the Product may increase the median survival rate to nearly 15 years in treated newborns" (id.).
Integrity Bio "successfully served as Cyprium's CMO through the beginning stages of the Product's development and clinical trials and ultimately was acquired by Curia in August 2021. In total, Cyprium has paid to Integrity Bio/Curia nearly $5.5 million for its CMO services" (id., ¶ 41).
Following pre-clinical testing and Phase I, II, and III clinical trials, Cyprium initiated a rolling submission of a new drug application ("NDA") for the Product to the United States Food and Drug Administration ("FDA") (see id., ¶ 44). The Product was "eligible for rolling submission of the NDA due to the Fast Track and Breakthrough Therapy designations given to it by the FDA. As a result, Cyprium can submit sections of the NDA for review and approval by the FDA as they are completed" (id.; see id., ¶¶ 10-11).
Pursuant to a Master Services Agreement dated December 9, 2021 (see Petition, Ex. 1 ["MSA"]), Cyprium engaged Curia to provide "process development and manufacturing services in connection with the NDA for the Product" (id., ¶ 47). The particular services to be rendered by Curia shall be set forth in work orders, which "allows the parties to contract for multiple [s]ervices . . . without having to re-negotiate the basic terms and conditions" of the MSA (¶ 2 [a]).
At issue herein are the two work orders dated February 23, 2022 (see Petition, Exs. 2-3 [*3]["Work Orders"]). Under the Work Orders, Curia agreed to manufacture two batches of the Product at the Camarillo Facility "to demonstrate that the manufacturing facility modifications produce a product of equivalent or better quality than . . . batches produced pre-modification" (Work Orders, § 1). The Work Orders explicitly call for the batches to "be manufactured using commercial production standards" (id.). And due to the use of commercial production standards, Curia charged Cyprium almost double the price of prior clinical batches (see Petition, ¶ 54; Parikh Aff., ¶ 19).
The Camarillo Facility historically "has made only clinical batches of drug product for its customers, meaning batches to be used for clinical trials" (Parikh Aff., ¶ 9). But to obtain approval of the NDA, "either Cyprium or Sentynl will need a commercial manufacturer. Curia Bio has been anticipating the possibility of becoming the commercial manufacturer for Copper Histidinate for several years . . ." (id., ¶ 9).[FN1]

For this reason, "[t]he Camarillo facility has been making upgrades over the past few years to prepare itself to be a commercial manufacturer" (NYSCEF Doc No. 17 ["Alexander Aff."], ¶ 15) and "for an eventual Pre-Approval Inspection ('PAI') by the [FDA], which . . . is part of the NDA process" (NYSCEF Doc No. 18 ["Finnley Aff."], ¶ 9). Thus, the successful production of new batches would confirm "that the facility modifications did not adversely affect the production of Copper Histidinate" (Parikh Aff., ¶ 16).
On April 7, 2022, Curia invoiced Cyprium for the Work Orders (see NYSCEF Doc Nos. 25-26 ["Invoices"]). The Invoices included fees for the manufacturing work, as well as Curia's project management services (see id.; Work Orders, § 7.1; see also Finnley Aff., ¶ 22).
The MSA required Cyprium to make an upfront payment of 30% of the overall value of the Work Orders (see MSA, ¶ 6 [b]; Work Orders, § 7.2) and "pay each invoice . . . within thirty (30) days of the date such invoice is sent" (MSA, ¶ 6 [c]). However, "[i]f any portion of an invoice is disputed in good faith, [Cyprium] will pay the undisputed amounts and promptly notify Curia in writing of the nature of the dispute, whereupon the parties will use good faith efforts to reconcile the disputed amount as soon as practicable" (id.). 
Cyprium alleges that, around the time the Invoices were issued, Curia began delaying production of the new batches (see Petition, ¶ 55). "On March 30, 2022, Curia informed Cyprium of an issue with the raw materials testing and release and, a week later on April 5, 2022, Curia pushed the target manufacturing dates back to April 18 and 25. Then, Curia informed Cyprium that a second unspecified quality-assurance issue arose on or about April 11, 2022, and Curia pushed the target manufacturing dates back again to April 25 and May 2, 2022. Curia informed Cyprium of a third purported quality-assurance issue that supposedly had arisen on or about April 18, 2022 and again extended the target manufacturing dates to May 2 and 9, 2022" (id., ¶ 56).
On April 20, 2022, Cyprium's counsel wrote to Curia in connection with a dispute concerning the testing regimen for the new batches (see NYSCEF Doc No. 46). That dispute ultimately implicated a long-festering dispute that preceded the signing of the Work Orders: whether Curia would be manufacturing "commercial batches" of the Product, as requested by Cyprium, or producing clinical batches "using commercial production standards," as Curia [*4]insisted (see NYSCEF Doc Nos. 24, 51). On April 26, 2022, Cyprium was informed that there was an out-of-specification test result that would further delay manufacturing of the Product (see NYSCEF Doc No. 46). 
At Cyprium's request, a teleconference was held on April 29, 2022. Cyprium claims that no one from Curia "could provide a meaningful explanation for the delays" or for Curia's position that it was not obliged to test the confirmation batches in accordance with FDA regulations governing Good Manufacturing Practices ("GMP") and commercial production standards (Petition, ¶ 61). "Given Curia's apparent inability and unwillingness to deliver the manufacturing services that it promised under the February 23 Work Orders, Cyprium made clear during the April 29th teleconference that no payment on the Disputed Invoices would be forthcoming until the parties' issues were resolved" (id., ¶ 62).
"Curia concluded the April 29th teleconference by assuring Cyprium that it would meet internally to discuss the disputes and would be in touch shortly with a proposed solution. Instead, the next communication that the parties had regarding this ongoing dispute was Curia's June 9, 2022 Termination Letter. Curia never once inquired or followed up about any invoices that it claimed in that letter to have been delinquent" (id., ¶ 63 [citation omitted]).
Curia presents a very different version of events. Curia asserts that Cyprium raised no objection when the Invoices were presented (see NYSCEF Doc Nos. 34-35), and it heard nothing further about the Invoices until after termination of the MSA and Work Orders on June 9, 2022 (see Finnley Aff., ¶¶ 22-24). According to Curia, Cyprium never disputed that the initial 30% deposit and project management fees were owed prior to termination (see id.; Parikh Aff., ¶¶ 25-28). And despite detailed meeting minutes and project notes, Curia has no record of Cyprium raising a payment dispute during the April 29, 2022 teleconference (see Finnley Aff., ¶¶ 23-24, 27; Parikh Aff., ¶¶ 27-28).
"On June 9, 2022, with deposit fees over three months in arrears, invoices for project management fees that remained unpaid, and strong suspicions that Cyprium had wrongfully made regulatory filings without involving Curia, Curia decided that its only viable option was to terminate the [Work Orders] and MSA" (Parikh Aff., ¶ 30; see NYSCEF Doc No. 27 ["Termination Letter"]).
Curia's letter states that the termination was made under Section 18 (b) (i) of the MSA, which permits a party to terminate for material breach "effective upon [45] days prior written notice" if the other party does not cure the breach; "provided, however, that failure by [Cyprium] to pay undisputed amounts due . . . within [15] days after such payments are due shall constitute cause for immediate termination." 
Additionally, the Termination Letter states, "[u]pon information and belief, [that] Cyprium breached the MSA's terms some time in February 2022 by filing an updated version of Module 3 of [the NDA] and Investigational New Drug Application ('IND') with the [FDA] over Curia's written objections." Under the MSA, Cyprium agreed to "make available to Curia the Curia-specific portions of all regulatory [filings] and all correspondence with a regulatory authority . . . relating to the Product," to incorporate all changes provided by Curia that "correct for factual inaccuracies," and "to reasonably consider all other comments" (MSA, ¶ 10 [e]).
In this regard, the Termination Letter refers to a February 18, 2022 communication from Cyprium advising Curia that, "in the forthcoming filings, [the Camarillo Facility] would no longer be classified as a clinical site, but as a commercial site for the manufacture of [the Product]" (Termination Letter, p. 2). Despite Cyprium stating that it would make this filing [*5]against the advice of Curia's regulatory personnel, "Curia was never provided a draft of the amended filing, nor an opportunity to comment or correct the factual inaccuracy that Curia was prepared to commence commercial manufacturing" (id.). 
Cyprium responded to the Termination Letter by taking the position that the Invoices were disputed, and it had 45 days to cure any breach concerning the regulatory filings (see NYSCEF Doc No. 37). However, Curia declined to rescind the termination (see NYSCEF Doc No. 38). The parties then discussed possible business solutions but were unable to reach agreement (see Petition, ¶ 73; see also NYSCEF Doc Nos. 41-44).
Cyprium also attempted to cure any breach concerning the regulatory filing and requested Curia's input (see NYSCEF Doc No. 28). Curia instructed Cyprium that, because its manufacturing work was clinical rather commercial, it was not appropriate to list Curia Bio in the Form 356h or to list the Camarillo Facility as ready for a PAI; instead, Curia directed Cyprium to identify the facility status as "withdrawn" (id.). However, after speaking to someone at the FDA, Cyprium changed the manufacturing site status to "TBD" (id.).
Cyprium commenced this proceeding on August 4, 2022 through the electronic filing of the Petition, supporting papers and a proposed Order to Show Cause for a preliminary injunction requiring Curia to perform its obligations under the MSA and the Work Orders during the pendency of the arbitration (see NYSCEF Doc No. 8). The proposed Order to Show Cause included a temporary restraining order staying Curia's termination of the MSA (see id.).
Following a hearing held on August 5, 2022 and continued on August 8, 2022 (see NYSCEF Doc Nos. 63-64), the Court signed the Order to Show Cause bringing on the injunction application (see NYSCEF Doc No. 12 ["OTSC"]). The Court denied Cyprium's request for a TRO staying termination of the MSA, but it did order Curia to provide Cyprium with:
at least 72 hours prior written notice before taking any action that may prevent it from performing its alleged obligations under the MSA if directed to do so by the Court, including the alleged obligations to (i) manufacture the Product called for under the February 23 Work Orders and (ii) support Cyprium's [NDA] for the Product pending before the [FDA]. To the extent that Cyprium believes that the contemplated action(s) disclosed by Curia would interfere with Curia's ability to perform under the requested preliminary injunction, Cyprium retains the right to seek appropriate temporary relief from the Court (id.).
Curia opposes the preliminary injunction motion and cross-moves for an order compelling Cyprium to arbitrate and staying this proceeding pending arbitration (see NYSCEF Doc No. 61). Oral argument was held on August 24, 2022, a copy of the hearing transcript was filed on August 30, 2022 (see NYSCEF Doc No. 79 ["Transcript"]), and this expedited Decision & Order follows.
I. CURIA'S CROSS MOTION TO STAY/COMPEL
The Court begins with Curia's cross motion to compel Cyprium to arbitrate its application for preliminary injunctive relief and to stay this proceeding during the pendency of the [*6]arbitration.[FN2]
 Curia argues that the Federal Arbitration Act ("FAA") requires the arbitrator to decide all issues of arbitrability and supplants inconsistent provisions of state law, including CPLR 7502 (c) (see NYSCEF Doc No. 62 ["XMOL"], p. 2). Curia further contends that the MSA's broad arbitration clause (see MSA, ¶ 20 [d]) evinces the parties' intention to arbitrate "any and all disputes," including disputes concerning interim injunctive relief (XMOL, p. 2).
In executing the MSA, the parties agreed that "[a]ll disputes arising from or related to" the MSA "shall be submitted to arbitration before a single arbitrator, administered by the American Arbitration Association (AAA) in Albany, New York . . . under the Commercial Arbitration Rules" (MSA, ¶ 20 [d]). "The arbitrator shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of the agreement to arbitrate . . ." (id.). The MSA "and all actions, causes of action, or claims of any kind that may be based upon, arise out of, or relate to [it], or the negotiation, execution, or performance of [the MSA], shall be governed by, interpreted under, and construed in accordance with the laws of State of New York, without regard to the principles of conflicts of law" (id.). 
As Cyprium observes, the power of courts to issue an injunction in aid of arbitration is well recognized both under the FAA and CPLR 7502 (c). Under the FAA, the "Second Circuit has repeatedly held that courts retain the power, and the responsibility, to consider applications for preliminary injunctions while a dispute is being arbitrated" (General Mills, Inc. v Champion Petfoods United States, Inc., 2020 WL 915824, *3, 2020 US Dist LEXIS 32924, *7-8 [SD NY, Feb. 26, 2020, No. 20-CV-181 (KMK)] [collecting cases]). The duty of the federal district courts to "consider the merits of a requested preliminary injunction even where the validity of the underlying claims will be determined in arbitration" is not "affected by the pro-arbitration policy manifested in the FAA" (American Exppress Fin. Advisors v Thorley, 147 F3d 229, 231 [1998]).
CPLR 7502 (c) was enacted by the New York State Legislature for the purpose of "equat[ing] the relief available in state court with that available in federal court" (SG Cowen Sec. Corp. v Messih, 224 F3d 79, 83 [2d Cir 2000]). As such, the New York courts will, in proper cases, grant "judicial injunctions in aid of arbitration, in keeping with the [FAA]" (Cell Tower Lease Acquisition, LLC v Rego Park N.H. Ltd., 144 AD3d 453, 453 [1st Dept 2016]; see Matter of Rockwood Pigments NA, Inc. v Elementis Chromium LP, 124 AD3d 509, 510-511 [1st Dept 2015] [granting injunction in aid of arbitration where parties agreed "that all disputes arising out of or relating to the agreement . . . shall be submitted to arbitration"]).
And contrary to Curia's contention, there is nothing in the MSA evincing the parties' intention to foreclose Cyprium from exercising its "extant, independent legal right" to pursue an injunction in aid of arbitration under CPLR 7502 (c) (General Mills, 2020 WL 915824, *6; 2020 US Dist LEXIS 32924, *16). This is not a case like Matter of Diamond Waterproofing Sys., Inc. v 55 Liberty Owners Corp. (4 NY3d 247, 252-253 [2005]), where the issue was whether the contracting parties had affirmatively demonstrated their intention to displace the default rule under the FAA and have the court, rather than the arbitrator, decide the threshold question of timeliness. The parties here contracted to apply New York law in a legal landscape in which CPLR 7502 (c) consistently has been interpreted to allow injunctions in aid of arbitration. If the [*7]parties intended to foreclose the usual application of CPLR 7502 (c), it was incumbent upon them to express that intention in the MSA through clear language.[FN3]

Nor does the parties' selection of the Commercial Arbitration Rules of the AAA, which permit the arbitrator to grant "interim measures" and "emergency measures of protection," deprive this Court of jurisdiction to grant an injunction in aid of arbitration under CPLR 7502 (c). In fact, the Commercial Arbitration Rules expressly recognize that "[a] request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate" (Rule 38 [c]; accord Rule 39 [h]; see also Next Step Med. Co., Inc. v Johnson & Johnson Intern., 619 F3d 67, 70 [1st Cir 2010]).
Based on the foregoing, the cross motion is denied.
II. CYPRIUM'S MOTION FOR PRELIMINARY INJUNCTION
Under CPLR 7502 (c), a court may grant a preliminary injunction in connection with a pending arbitration "upon the ground that the award to which the applicant may be entitled may be rendered ineffectual without such provisional relief." The movant "must also demonstrate a probability of success on the merits, danger of irreparable injury in the absence of a preliminary injunction, and a balance of the equities in [its] favor" (Matter of Patrolmen's Benevolent Assn. of the City of NY, Inc. v City of New York, 112 AD3d 116, 118 [1st Dept 2013]; see SG Cowen, 224 F3d at 84).
A. Ineffectualness / Irreparable Harm [FN4]
A movant for a preliminary injunction must establish that it is likely to suffer irreparable harm absent the requested relief. Of the traditional equitable criteria for an injunction, "a showing of probable irreparable harm is the single most important prerequisite" (Reuters Ltd. v United Press Intl., Inc., 903 F2d 904, 907 [2d Cir 1990] [internal quotation marks and citations omitted]). Irreparable harm means an injury for which a monetary award alone cannot be adequate compensation (see Town of Liberty Volunteer Ambulance Corp. v Catskill Regional Med. Ctr., 30 AD3d 739, 740 [3d Dept 2006]).
Coupled with the ineffectualness requirement of CPLR 7502 (c), Cyprium has the burden of establishing that a preliminary injunction is necessary to (1) avert imminent and irreparable harm, and (2) prevent an eventual arbitral award in its favor from being rendered ineffectual.
Cyprium maintains that a preliminary injunction is needed to avoid irreparable harm to [*8](1) infants suffering from Menkes disease, (2) the NDA, and (3) Cyprium's ability to continue as a going concern to see the NDA through to fruition.
The chain of harms alleged by Cyprium begins with the fact that Curia is the only manufacturer of the Product (see Petition, ¶ 34).[FN5]
Cyprium contends that it would take 12 to 18 months to transition to a new CMO capable of manufacturing the Product in accordance with current GMP ("cGMP") (see id., ¶¶ 9, 33-34, 82). This delay in bringing a new CMO on board and transferring Curia's manufacturing technology would delay approval of the NDA by several years, according to Cyprium (see id., ¶ 81).
In the meantime, babies and infants with Menkes disease are receiving clinical doses of the Product, but Cyprium will "run out of Product . . . no later than the fall of 2023" (id., ¶ 82). "It is therefore certain that there will be a substantial gap in the availability of the Product absent immediate court intervention" (id., ¶ 83). Additionally, given the success of the clinical trials, Cyprium "continues to receive requests from additional children suffering from Menkes disease (including, for example, requests from at least 10 children in . . . June 2022)" (id., ¶ 33). 
In the longer term, Cyprium emphasizes the irreparable harm to the "additional dozens or hundreds" of children with Menkes disease who would benefit from treatment with the Product following FDA approval (id., ¶ 81). In addition to allowing the Product to be distributed to all children suffering from Menkes disease, FDA approval would raise awareness of the disease and promote newborn screening (see id.).
Cyprium recognizes that approval of the NDA is not guaranteed, but it emphasizes that the Product has proven safe and effective in pre-clinical testing and Phase I, II and III clinical trials (see id., ¶¶ 10, 44), and the FDA granted "Breakthrough Therapy, Fast-Track, Rare Pediatric Disease and Orphan Drug" designations to the Product (id., ¶ 11), thereby making it eligible for a fast-tracked NDA process (see id., ¶ 44). Together with the absence of any other treatment for a fatal illness afflicting babies and infants (see id., ¶ 43), Cyprium believes it highly likely that the FDA will approve the NDA if the parties continue to work together to fulfill the Work Orders.
On the other hand, Cyprium contends that if Curia's termination is allowed to stand, approval of the NDA will be delayed by several years, and there are serious doubts as to whether the company can continue as a going concern through this period of extended delay. 
Cyprium explains that its business is premised entirely on the development and commercialization of the Product (see id., ¶ 8). It is a small company with limited financial resources, and timely FDA approval of the NDA "is essential to Cyprium's continued existence" (id., ¶ 32). "Cyprium has limited cash on hand, and existing capital commitments are all tethered to timely approval of the NDA by the FDA" (id., ¶ 87). And delays in the NDA process will hamper Cyprium's ability to attract additional capital, which would require the company "to lay off employees, curtail research and development activities, and potentially close its doors altogether, before the Product ever can be distributed widely to those suffering from Menkes disease" (id., ¶ 86).
In other words, "Cyprium's funding will quickly dry up unless Curia's unlawful [*9]termination of the MSA is reversed and its obligations under the other incorporated agreements are reinstated" (id., ¶ 88).
The same claims of irreparable harm underlie Cyprium's contention that an eventual arbitral award in its favor would be ineffectual absent a preliminary injunction. Cyprium expects that it would take about one year for a final award to be rendered, and in the meantime there will be a shortage of clinical doses for current patients, Cyprium will be forced to start the long and expensive process of transitioning to a new CMO, the FDA's consideration of the NDA will be delayed by several years, and Cyprium is unlikely to remain in business long enough to see the NDA through to a successful conclusion.
In its answering papers, Curia argues principally that Cyprium's claims of irreparable harm and ineffectualness are speculative and inadequately supported. Curia further indicates its willingness to expedite the arbitral process, with the hope that an award could be rendered within six (6) months (see NYSCEF Doc No. 14 ["Opp Mem"], pp. 14-15).[FN6]

As to Cyprium's concerns for its clinical patients, Curia asserts that there are 6,685 vials of the Product in inventory at the Camarillo Facility, Cyprium has not requested shipments of the Product from Curia since May 2022, and Cyprium has used an average of only about 4,300 vials per year (see Finnley Aff., ¶ 30). Curia further argues that if the existing clinical supply proves insufficient, Cyprium is free to seek interim relief before the arbitrator.
As observed by Cyprium in reply, however, the vial numbers cited by Curia appear to be outdated and not reflective of current usage levels (see NYSCEF Doc No. 66 ["Rosenwald Aff."], ¶¶ 23-24). According to Dr. Lindsey Rosenwald, Cyprium's executive chairman and a licensed physician:
The historical inventory usage levels that Curia cites are outdated and do not account for recent developments that have increased awareness of [the Product] in both the medical and patient communities. Over the last year, Cyprium has seen a marked increase in compassionate-use requests for new patients . . . . For example, Cyprium received ten new requests in June of this year alone; this is compared to seven patients who initiated treatment in 2021. As a result, Cyprium's inventory usage levels have increased approximately 64% on an annual basis over the last 12 months. If those usage levels hold, Cyprium is projected to run out of inventory to supply to patients by no later than March [2023] without any additional manufacturing (id., ¶ 24 [emphasis added]).
Relatedly, Dr. Rosenwald points out that "much of the additional inventory held by Curia consists of single-use vials, as opposed to the multi-use vials that Curia previously had manufactured and were used in patients. As a result, Curia's reliance on Cyprium's historical usage of multi-use vials to project how long the single-use vials will last is an apples-and-oranges comparison" (id., ¶ 25; see id., ¶ 26). Limited to its current inventory, Cyprium will be unable to enroll new patients after December 2022, and it cannot guarantee that current patients will be able to complete their treatment (see id., ¶ 27).
Further, Curia's argument that Cyprium could pursue interim relief before the arbitrator if the existing clinical supply proves insufficient elides over the real risk that Curia may, during the pendency of the arbitration, enter into commercial agreements with other drug companies that leave it without the capacity to manufacture additional Product (see id., ¶¶ 20-21, 29).[FN7]
And while Cyprium may be entitled to pursue interim relief under the Commercial Arbitration Rules, the availability of an alternative forum does not negate its showing of irreparable harm here.
Next, Curia argues that Cyprium has not presented evidence of any efforts to secure a different CMO. Curia observes that the Cyprium/Sentynl agreement gave Sentynl the right to qualify additional CMOs in parallel with Cyprium's development of the Product (see NYSCEF Doc No. 31, § 5.7 & Schedule 2.1.5, ¶ 6). Curia also submits evidence that it referred Cyprium to several other CMOs "that may be an appropriate fit for Cyprium's project" (NYSCEF Doc No. 42).
Cyprium responds that it "already has contacted multiple different manufacturers over the last two months but has to date been able to find only two manufacturers that currently appear willing and reasonably capable of manufacturing [the Product]. Even then, in the event that Cyprium is eventually able to identify a suitable replacement manufacturer, it is still anticipated that a technology transfer . . . would take around 15 months . . . a timeframe corroborated by Curia itself in an offer to arrange for a tech transfer to one of its other facilities" (Rosenwald Aff., ¶ 21; see also id., ¶ 33). And while Curia claims that "other manufacturers would be able to move more quickly" in producing the Product (Opp Mem, p. 15), it has not adduced any admissible evidence to support this claim.
Curia further argues that harms predicated upon the FDA's approval of the NDA are speculative, as it is unknown whether and when such approval may issue (see id. ["future demand (for the Product) is subject to an uncertain regulatory determination outside of the parties' and the arbitrator's control"]). Cyprium acknowledges that approval of the NDA is no sure thing, but insists that the Product is on the "cusp" of FDA approval and estimates a likelihood of greater than 90% in light of the successful clinical trials, the FDA's special designations of the Product, and the lack of any alternative treatment for Menkes disease (see Rosenwald Aff., ¶ 35; NYSCEF Doc No. 67, p. 14).
Curia further complains that the record does not include any specifics regarding Cyprium's funding sources or available capital. Curia observes that Cyprium is owned by "Fortress Biotech, a publicly traded company worth over $125 million" (Opp Mem, p. 22). Cyprium responds, through its executive chairman, that a "delay of months or years in the NDA submission process would be a death knell for Cyprium. Cyprium has limited access to capital, and . . . it will be increasingly difficult for Cyprium to raise new capital," particularly in the current economic climate (Rosenwald Aff., ¶ 30).
Upon due consideration of all of the evidence submitted by the parties, the Court finds that, absent a preliminary injunction, there will be an insufficient supply of the Product to treat clinical patients, the NDA for the Product will be substantially delayed, and Cyprium's ability to continue as a going concern and see the NDA through to fruition will be severely jeopardized [*10](see Bionpharma Inc. v CoreRx, Inc., 2022 WL 246742, *6, 2022 US Dist LEXIS 15287, *18 [SD NY 2022, Jan. 27, 2022, No. 21-cv-10656 (JGK)]). These are harms that cannot be fully remedied through an eventual award of money damages. The Court further finds that an arbitral award in Cyprium's favor in one year from now (or even months sooner) would not be effectual absent an injunction (see Rockwood, 124 AD3d at 511).
B. Likelihood of Success
To obtain a preliminary injunction, Cyprium also must demonstrate a likelihood of success on the merits. In this context, "likelihood of success is . . . measured in terms of the likelihood of success in arbitration" (Cowen, 224 F3d at 84). 
[A]rbitration is frequently marked by great flexibility in procedure, choice of law, legal and equitable analysis, evidence, and remedy. Success on the merits in arbitration therefore cannot be predicted with the confidence a court would have in predicting the merits of a dispute awaiting litigation in court, and it can be expected that when the merits are in the hands of an arbitrator, this element of the analysis will naturally have greatly reduced influence (id.).
Cyprium asks the arbitrator to declare that "Curia had no lawful basis to terminate the MSA under Section 18 (b) (i) based on non-payment of the . . . Invoices because Cyprium placed Curia on notice, both in writing and verbally, that it was disputing that any amounts were due and owing on [the Invoices] given the fundamental dispute regarding the nature of the work to be performed by Curia under the . . . Work Orders" (NYSCEF Doc No. 73, ¶ 93). 
Cyprium also seeks a declaration that Curia's termination of the MSA based upon the February 2022 filing "was unlawful because the information in the Form 356h was accurate, and, even if it was not, the alleged breach was not material" (id., ¶ 94). Additionally, Cyprium claims to have "timely cured any alleged material breach by filing an updated Form 356h removing any references to Curia or the Camarillo Facility, as instructed by the FDA" (id.).
1. The Invoices
The MSA obliged Cyprium to make an upfront payment of 30% (see MSA, ¶ 6 [b]; Work Orders, § 7.2) and "pay each invoice issued by Curia within thirty (30) days of the date such invoice is sent" (MSA, ¶ 6 [c]). However, "[i]f any portion of the invoice is disputed in good faith, [Cyprium] will pay the undisputed amounts and promptly notify Curia in writing of the nature of the dispute, whereupon the parties will use good faith efforts to reconcile the disputed amount as soon as practicable" (id.). 
Cyprium argues that it gave Curia oral and written notice of a fundamental dispute regarding the services to be rendered under the Work Orders, thus precluding termination under the safe harbor of Section 6 (c) of the MSA.
Even before the Work Orders were signed, Cyprium and Curia were at odds regarding the purpose of the new manufacturing work (see NYSCEF Doc No. 19 ["Woltering Aff."], ¶ 17). Curia took the firm position that the "intent of the two confirmation batches is to demonstrate that the manufacturing facility modifications produce a product of equivalent or better quality than [the] batches produced pre-modification" (NYSCEF Doc No. 24). "These batches are considered Confirmatory batches 
NOT Commercial batches" (id. [emphasis in original]; see [*11]Parikh Aff. ¶¶ 16-22).
Cyprium, on the other hand, insisted that the new batches were "commercial" because Curia would be manufacturing the Product to commercial standards and charging "commercial" prices, "regardless of the[] ultimate intended use" for the Product (NYSCEF Doc No. 51; see Woltering Aff., ¶¶ 19-20; see also Petition, ¶ 54).[FN8]

It appears that the parties ultimately "papered over" their differences by agreeing on compromise language that required the production of confirmation batches "manufactured using commercial production standards" (Work Orders, § 1).
The parties' misalignment spilled over into disputes concerning applicable testing requirements (see NYSCEF Doc No. 46; see also Petition, ¶¶ 57-58). It also appears that Curia experienced several delays in attempting to manufacture the Product to commercial production standards (see Petition, ¶¶ 55-56), and Curia advised Cyprium on April 26, 2022 that there was an out-of-specification test result that would further delay production (see NYSCEF Doc No. 46). 
Cyprium claims that Curia was unable to provide a reasonable explanation for the delays or for its position that it was not obliged to conduct testing in accordance with commercial standards (see Petition, ¶ 61). "Given Curia's apparent inability and unwillingness to deliver the manufacturing services that it promised under the February 23 Work Orders, Cyprium made clear during the April 29th teleconference that no payment on the Disputed Invoices would be forthcoming until the parties' issues were resolved" (id., ¶ 62; see also id., ¶ 18). Cyprium further observes that "Curia never once inquired or followed up about any invoices that it claimed in [the Termination Letter] to have been delinquent" (id., ¶ 63 [citation omitted]).
Curia acknowledges that the parties were "not aligned" on the fundamental question of whether the new batches of the Product "would be designated as commercial or confirmation batches" (Woltering Aff., ¶ 17). Additionally, there were "numerous disagreements" about technical and quality control issues (Finnley Aff., ¶¶ 14-16), and many of these disputes remained unresolved at the time of the termination (see id., ¶ 16). However, Curia insists that Cyprium did not provide it notice of any dispute concerning the Invoices and that it otherwise lacked actual knowledge of any such dispute.
Anish Parikh, who is responsible for Curia's sales and marketing activities, avers that he participated in the April 29, 2022 teleconference, and "at no time during that discussion did Cyprium claim that it was disputing Curia's right to payment on the confirmation batches that are the subject of the [Work Orders]" (Parikh Aff., ¶ 27). "If Cyprium had said anything to indicate that it was disputing Curia's right to payment, Curia would have needed to regroup internally and decide whether to proceed . . . while an invoice dispute was percolating" (id.).
To similar effect is the affidavit testimony of Mariko Finnley, Curia's director of program management (see Finnley Aff., ¶¶ 5, 24). "During that meeting, nothing was said to indicate . . . that Cyprium would not pay its invoices" (id., ¶ 24). "Had Cyprium told us it would not pay Curia's invoices during the meeting, that would have been a significant point" (id.).
Cyprium has not adduced any evidence showing that it gave Curia written notice of a dispute concerning the Invoices. To be sure, the record is replete with communications [*12]concerning "disputes" between the parties, including their fundamental disagreement regarding confirmation/commercial batches, disputes concerning the proper testing regimen, disputes concerning production delays, and disputes regarding quality issues. But Cyprium has not supplied any writing that disputes the Invoices, either in their entirety or as to any particular charge. 
There is, however, a sharp factual dispute as to the issues of oral or actual notice (see Latham Land I, LLC v TGI Friday's, Inc., 96 AD3d 1327, 1328-1329 [3d Dept 2012] [finding substantial compliance with contractual promise to provide written notice where recipient had actual notice]; Dellicarri v Hirschfeld, 210 AD2d 584, 585 [3d Dept 1994]; cf. Ridley Elec. Co., Inc. v Dormitory Auth. of the State of NY, 152 AD3d 1129, 1132 [3d Dept 2017] [where prior written notice is a contractual condition precedent to recovery, strict compliance is required]). The averments of the Petition support a finding of oral or actual notice (see Petition, ¶¶ 18, 62), whereas the affidavits submitted by two of Curia's executives present an entirely different version of events (see Parikh Aff., ¶ 27; Finnley Aff., ¶ 24). 
Curia's version of events appears to be more plausible, given the absence of any meeting minutes, notes, emails or letters memorializing or responding to the assertion of a payment dispute by Cyprium.
On the other hand, the April 29, 2022 teleconference occurred at a time when the parties were bogged down in disputes concerning production delays, disputes concerning quality issues, disputes over testing requirements, and the over-arching dispute over confirmation/commercial batches. It certainly is not implausible or unreasonable to believe that Cyprium indicated during the teleconference that payment on the Invoices would not be forthcoming until there was a path forward on the Work Orders, even if financial issues were not the focus of the teleconference. And regardless of what was or was not said, Curia obviously was aware of disputes permeating almost every aspect of the Work Orders; as such, Curia may have had actual knowledge that its right to be paid for the disputed work also was disputed.
Under the circumstances, the Court concludes that Cyprium has demonstrated a fair, but not overwhelming, likelihood of prevailing before the arbitrator on its challenge to Curia's termination of the MSA for non-payment of the Invoices.
2. Regulatory Correspondence
In the Termination Letter, Curia further asserted that Cyprium breached Section 10 of the MSA "some time in February 2022 by filing an updated version of [Form 356h] with the [FDA] over Curia's written objection. Cyprium did so without providing drafts of the document[] to Curia for its review and comment prior to filing" (Termination Letter, p. 1).
Section 18 (b) (i) allows a party to terminate the MSA "effective upon [45] days prior written notice to the other party, if the other party commits a material breach . . . and fails to cure such breach by the end of such [45] day period . . . ." And under Section 10 (e), captioned "Regulatory Correspondence," Cyprium "shall make available to Curia the Curia-specific portions of all regulatory applications and amendments thereto and all correspondence with a regulatory authority, in each case relating to the Product."[FN9]
Cyprium "agree[d] to incorporate all [*13]changes provided by Curia which correct for factual inaccuracies and to reasonably consider all other comments" (id.).
Initially, Cyprium contends that its February 2022 filing did not identify the Camarillo Facility as a commercial site (see NYSCEF Doc No. 9 ["MOL"], p. 16). But, as Curia observes, the Form 356h is used for "applications that seek approval for commercial manufacturing and distribution" (Woltering Aff., ¶ 28).
Cyprium further argues that the Camarillo Facility was ready for FDA inspection, citing the fact Curia allowed an inspection by the California Department of Public Health ("CDPH") in April 2022 (see MOL p. 17). However, Curia convincingly responds that Cyprium's "comparison is completely inapt. A PAI inspection . . . focuses on quality assurance and cGMP adherence, seeking to identify any issues with the production of a specific drug product. By comparison, a CDPH inspection is more generalized and focuses on whether the facility has appropriate documentation in place and [complies] with state-level licensing requirements" (Alexander Aff., ¶ 22; see Woltering Aff., ¶¶ 9-10; NYSCEF Doc No. 16, ¶ 17). And even if the February 2022 filing was factually accurate, it was not made available to Curia.
Cyprium is on stronger ground, however, with the argument that it had 45 days to cure any material breach of the MSA. Curia implicitly concedes that the June 9, 2022 Termination Letter was the first written notice given to Cyprium of the alleged breach of Section 10 (see Opp Mem, p. 20 ["the 45-day cure period lapsed with no further action"]).
Following receipt of the Termination Letter, Cyprium sought Curia's input on a cure (see NYSCEF Doc No. 28). Curia advised that, since it "will not manufacture for Cyprium beyond producing product for clinical trials, it is not appropriate to list Curia within [the Form] 356h" or answer the question regarding the Camarillo Facility's readiness for inspection (id.). Cyprium responded that it would be removing Curia's information from Form 356h and inserting "TBD," based on oral advice that Cyprium obtained from someone at the FDA (id.)
Curia complains that Cyprium's filing did not cure the earlier breach and, in fact, compounded it. Curia asserts that it never received a copy of the filing, and it was improper for Cyprium to communicate directly with the FDA (see Woltering Aff., ¶¶ 24-26). "[I]t would have been better for Cyprium to allow Curia to tell the FDA itself that the facility was not ready for inspection" (id., ¶ 27).
Cyprium's direct communication with the FDA may have been irregular, but Curia acknowledges that the plain language of Section 10 (e) covers only written communications (see Opp Mem, pp. 19-20). Further, given that the amended filing removed any reference to Curia's Camarillo Facility, it is unclear whether Curia was entitled to receive a copy of the completed filing. And while the "better" approach certainly would have been for the parties to work in coordination, Curia has not sufficiently established that Cyprium's approach was violative of the MSA or likely to cause it harm.[FN10]

Thus, while Curia raises some legitimate questions as to whether Cyprium fully cured the alleged February 2022 breach(es) of Section 10, the Court finds that Cyprium is likely to prevail [*14]before the arbitrator on this issue.
C. Balancing of the Equities
A preliminary injunction in aid of arbitration is an equitable remedy that only will be granted where the balance of equities tips in favor of the requested relief. The Court "must weigh the interests of the general public as well as the interests of the parties to the litigation . . . [and] inquire into whether the irreparable injury to be sustained is more burdensome [to Cyprium] than the harm caused to [Curia] through imposition of the injunction" (Eastview Mall, LLC v Grace Holmes, Inc., 182 AD3d 1057, 1059 [4th Dept 2020] [internal quotation marks, alterations and citation omitted]).
1. Curia's Contentions
Curia maintains that it would suffer irreparable harm if "forced to manufacture commercial batches of Copper Histidinate" (Opp Mem, p. 23). While acknowledging that it worked collaboratively with Cyprium in July 2022 to develop a plan for doing exactly that, Curia cites: the time and expense associated with preparing the Camarillo Facility for commercial manufacturing (see Alexander Aff., ¶¶ 18, 25); the need for Cyprium and Curia to engage in joint discussions with the FDA regarding "the status of the facility's quality systems, manufacturing equipment and areas, as well as the additional controls and mitigation steps that would be taken to adhere to commercial cGMP expectations" (id., ¶ 24); certain "quality and regulatory" concerns attendant to an accelerated effort to produce "commercial batches" of Product (id., ¶¶ 23, 25); and the risk that the parties' efforts ultimately may prove unsuccessful (see id., ¶ 25).
Additionally, commercial production would entail dedicating the Camarillo Facility's lyophilizer — a multi-million dollar piece of equipment — to the Product in order to avoid the risk of cross-contamination (see id., ¶ 17). Curia's inability to undertake jobs for other customers using the lyophilizer (and related equipment) may prevent it from manufacturing other lifesaving and/or life-changing medications, including potential treatments for prostate cancer, hypothyroidism and macular degeneration (see Finnley Aff., ¶¶ 6-7).
Finally, Curia argues that the "parties' acrimonious relationship and the need for close collaboration counsels against an injunction" (Opp Mem, p. 24). While insisting that Curia "has done its best to work with Cyprium, the parties' relationship has been fractious" (id., citing Finnley Aff. ¶ 15; Parikh Aff., ¶¶ 17-22; NYSCEF Doc Nos. 24, 36, 46, 49-50; see Alexander Aff., ¶¶ 23-25). 
2. Cyprium's Position
Cyprium again emphasizes the irreparable harm that will befall Menkes patients, the NDA, and Cyprium itself if the requested preliminary injunction is not granted. 
Cyprium further argues that Curia will not be prejudiced by an injunction requiring it to perform under the Work Orders at the agreed-upon price. Cyprium emphasizes that Curia agreed to manufacture two batches of the Product using commercial production standards (for which it charged commercial prices), and Curia invested millions of dollars in the Camarillo Facility to be the commercial manufacturer of the Product (see Opp Mem, p. 5; Alexander Aff., ¶¶ 15, 17; Finley Aff., ¶¶ 10-12).
Cyprium disputes Curia's assumption that commercial batches would have to be manufactured on an overly expedited basis, and it observes that Curia's scope of work always [*15]contemplated use of the lyophilizer.
As to Curia's claim that the parties' contentious relationship counsels against an injunction, Cyprium observes that it has worked closely with Curia and Integrity Bio at the Camarillo Facility for years, and it is confident that the parties would work together in good faith to implement the terms of any injunction ordered by the Court.
Finally, Cyprium argues that any investments or other expenditures that Curia may incur in order to perform under the MSA and Work Orders can be quantified and addressed after the merits of the parties' disputes are resolved by the arbitrator.
Cyprium therefore contends that its interest and the interest of the general public in seeing an approved treatment for Menkes disease outweigh the potential harms cited by Curia.
3. Analysis
Upon weighing the relevant public and private interests, the Court finds that the irreparable injuries that are likely to be sustained absent an injunction outweigh the potential harms that Curia may suffer through imposition of an injunction.
Many of the harms identified by Curia can be quantified and compensated through an eventual award of money damages, and Cyprium will be required to post an undertaking in an amount sufficient to secure Curia's costs and damages if it ultimately is determined that Cyprium was not entitled to the preliminary injunction (see CPLR 6312 [b]; Part II [D], infra). 
As to the non-monetary harms identified by Curia, including quality and regulatory concerns (see Finnley Aff., ¶¶ 23, 25), the Court finds that Curia assumed certain of these risks in assenting to the MSA and the Work Orders, and other risks can be mitigated through careful management. Indeed, as recently as July 2022, Curia developed a plan to manufacture commercial batches of the Product at the Camarillo Facility by year end (see Alexander Aff., ¶¶ 22-25), though that plan ultimately was rejected by Cyprium (see id., ¶ 26).
Moreover, Curia did agree to manufacture batches of Product at the Camarillo Facility using "commercial production standards" (Work Orders, § 1), Curia "has been anticipating the possibility of becoming a commercial manufacturer of Copper Histidinate for several years and has entered into an agreement to make one batch of the [P]roduct for Sentynl" (Parikh Aff., ¶ 9), and Curia invested millions of dollars to ready the Camarillo Facility for commercial manufacturing (see Alexander Aff., ¶¶ 15, 18, 24; Woltering Aff., ¶¶ 14-15).
Regarding the public interest, Cyprium makes a persuasive case that it is likely to obtain approval of the NDA and bring a safe and effective treatment for Menkes disease to market. And while dedicating the Camarillo Facility's lyophilizer to commercial manufacture of the Product may leave Curia Bio unable to manufacture other important new drugs, these potential harms are largely speculative at this point.
Accordingly, while both parties work to save and improve lives by developing and manufacturing innovative drug therapies, the public interest weighs strongly in favor of Cyprium's effort to bring the Product to market expeditiously.
Based on the foregoing, the Court is satisfied that the balance of equities tips in favor of granting an injunction in aid of arbitration (see Bionpharma, 2022 WL 246742, *8-9, 2022 US Dist LEXIS 15287, *25-27).
D. Form of the Injunction
Having concluded that a preliminary injunction is necessary to prevent an eventual arbitral award from being rendered ineffectual and that the traditional equitable criteria for [*16]preliminary injunctive relief have been established, the Court must consider the form of the injunction. 
Cyprium seeks a preliminary injunction "requiring Curia to continue to perform its obligations under the [MSA], including but not limited to its obligations to . . . : (i) manufacture two commercial confirmation batches of [the Product], as required under the Work Orders . . . , which incorporate the terms of the MSA by reference . . . ; and (ii) support Cyprium's [NDA] for the Product" (OTSC).
This language adopts certain disputed positions taken by Cyprium. Most notably, Curia maintains that it is not obliged to produce "commercial batches" of the Product, but the proposed injunction would require Curia to manufacture "commercial confirmation batches" — a term that does not appear in the MSA or Work Orders and appears to suggest something other than confirmation batches "manufactured using commercial production standards" (Work Orders, § 1). And by directing Curia to support the NDA, the proposed injunction would treat the MSA as incorporating the Quality Agreement (see Petition, Ex. 5; MSA, ¶ 4 [a]; MOL, p. 7), another point disputed by Curia (see Opp Mem, p. 6; Transcript, pp. 60-61).
The fundamental object of an injunction in aid of arbitration is to "maintain the status quo pending the decision of the arbitrator to preserve the efficacy of a potential arbitral award" (Cove v Rosenblatt, 148 AD2d 411, 412 [2d Dept 1989] [internal quotation marks, brackets and citation omitted]). Here, "the last actual, peaceable uncontested status" (North Am. Soccer League, LLC v United States Soccer Fedn., Inc., 883 F3d 32, 37 [2d Cir 2018] [internal quotation marks and citations omitted]) was on June 8, 2022, prior to Curia's issuance of the Termination Letter. At that point, the MSA and Work Orders remained in effect, the Invoices were outstanding, Curia had not demanded a cure of any alleged material breach, and the parties remained divided on what it means to manufacture confirmation batches using commercial production standards.
As such, the Court finds that the injunction requested by Cyprium is mandatory in nature (see Johnson v Kay, 860 F2d 529, 541 [2d Cir 1988]; Matos v City of New York, 21 AD3d 936, 937 [2d Dept 2005]; see also MOL, pp. 12-13 [recognizing mandatory character of proposed relief]). For a mandatory injunction, Cyprium would be obliged to demonstrate a clear likelihood of success (see New York v Actavis PLC, 787 F3d 638, 650 [2d Cir 2015]), a showing that has not been made as to non-payment of the Invoices.
The Court also is concerned that a preliminary injunction requiring Curia to perform under the MSA and Work Orders would encroach on the arbitral process and the parties' agreement to arbitrate all disputes arising from or related to the MSA. Interpretation and enforcement of an injunction affirmatively directing contractual performance is likely to involve the Court in monitoring Curia's work and resolving substantive disputes concerning the MSA and Work Orders. And all the while, the parties would be entangled in a parallel arbitral process. Such an injunction would not "aid" the arbitration.
The Court therefore declines to order the form of preliminary injunction requested by Cyprium. Instead, the Court finds, in the exercise of discretion, that a more limited injunction is warranted: an injunction that stays Curia's termination of the MSA during the pendency of the arbitration (see Transcript, pp. 107-108 ["We're only asking you to stay what we believe to be an unlawful termination. Put the parties back in the position they were in on June 8th, 2022, with all of the rights and obligations that were under the MSA, the quality agreement, the work orders"]; see also OTSC [proposed TRO]).
By staying termination of the MSA while the parties work to resolve their disputes before the arbitrator in "an efficient and economical" fashion (MSA, ¶ 20 [d]), the preliminary injunction ordered herein will preserve the status quo and oblige Curia to do nothing more than what it agreed to in the MSA and Work Orders. And given the more limited form of injunction, the prospect of it causing substantial harm to Curia is significantly lessened, thereby tipping the equities even more strongly in favor of Cyprium.
E. Undertaking
CPLR 6312 (b) requires a party obtaining a preliminary injunction to "give an undertaking in an amount to be fixed by the court, that the [movant], if it is finally determined that [it] was not entitled to an injunction, will pay to the [enjoined party] all damages and costs which may be sustained by reason of the injunction." The undertaking must be "rationally related to the potential damages recoverable if the preliminary injunction is later determined to have been unwarranted" (Matter of Witham v Finance Invs., Inc., 52 AD3d 403, 404 [1st Dept 2008]).
The present record is not sufficiently developed to allow the Court to fix an appropriate undertaking (see Transcript, pp. 113-114). Accordingly, the parties shall confer regarding the submission of additional argument and evidence bearing on an undertaking, and either: (1) stipulate to the amount of an undertaking; (2) stipulate to a briefing/submission schedule for the purpose of the Court fixing an undertaking; or (3) request a conference with the Court if the parties are unable to arrive at an appropriate stipulation.
CONCLUSION
For all of the foregoing reasons, it is
ORDERED that Curia's cross motion to compel arbitration and stay this proceeding pending arbitration is denied; and it is further
ORDERED that Cyprium's motion for an injunction in aid of arbitration under CPLR 7502 (c) is granted; and it is further
ORDERED that, during the pendency of the arbitral process, Curia's Termination Letter dated June 9, 2022 is stayed and shall be given no force or effect; and it is further
ORDERED that, during the pendency of the arbitral process, Curia is enjoined from terminating the MSA; and it is further
ORDERED that the preliminary injunction set forth in the preceding paragraphs shall supersede and replace the temporary restraining order set forth in the OTSC; and it is further
ORDERED that the parties shall confer regarding a process and schedule for fixing an undertaking and, by September 19, 2022, either: (1) stipulate to the amount of an undertaking; (2) stipulate to a briefing/submission schedule for the purpose of the Court fixing an undertaking; or (3) request a conference with the Court if the parties are unable to arrive at an appropriate stipulation; and finally it is
ORDERED that, upon entry of an order fixing an undertaking and determination of the pending application to seal certain court records, this proceeding shall be stayed during the arbitral process, pending further order of Court.
This constitutes the Decision & Order of the Court, the original of which is being uploaded to NYSCEF for electronic entry by the Albany County Clerk. Upon such entry, counsel for Cyprium shall promptly serve notice of entry.
Dated: September 12, 2022
Albany, New York
RICHARD PLATKIN
A.J.S.C.
Papers Considered:
NYSCEF Doc Nos. 1, 9-12, 14-56, 61-73, 79.

Footnotes

Footnote 1:Cyprium has an agreement with Sentynl Therapeutics, Inc. ("Sentynl") to sell its rights in the Product if Cyprium obtains FDA approval (see NYSCEF Doc No. 31).

Footnote 2:To the extent that Curia seeks to compel Cyprium to arbitrate the underlying dispute(s), the parties already are participating in arbitration (see NYSCEF Doc Nos. 72-73).

Footnote 3:The Court recognizes the arbitrator's broad authority to decide gateway issues of arbitrability under the MSA (see Basile v Riley, 188 AD3d 1607, 1609 [4th Dept 2020]), but Curia has not identified any cases in which a court ruled that the arbitrator must determine whether the court may grant an injunction in aid of arbitration. The Court's research discloses only one such case (see Vertiv Corp. v SVO Bldg. One, LLC, 2019 WL 1454953, *3, 2019 US Dist LEXIS 56096, *5 [D Del, Apr. 2, 2019, No. 1:18-cv-01776 (RGA)] ["I am entirely without authority to resolve whether I have authority to resolve (the) request for a preliminary injunction."], criticized in General Mills, 2020 WL 915824, *6, 2020 US Dist LEXIS 32924 *17; see also Shubin v Slate Digit., Inc., 2022 WL 168152, *5, 2022 US Dist LEXIS 9958, *12-14 [SD NY, Jan. 19, 2022, No. 21 Civ. 9464 (PAE) [deciding CPLR 7502 (c) application on the merits even after declaring that the arbitration agreement delegated issues of arbitrability to the arbitrator]).

Footnote 4:Given that Cyprium's arguments regarding ineffectualness and irreparable harm are closely related, these two elements will be discussed together.

Footnote 5:The Petition is verified by Lung S. Yam, the chief executive officer of Cyprium (see id., p. 26). As such, the Petition is the equivalent of an affidavit for purposes of the instant motion practice (see CPLR 105 [u]).

Footnote 6:The parties agreed that the arbitrator could impose reasonable limits on discovery and the hearing to promote "an efficient and economical arbitration process" (MSA, ¶ 20 [d]). But given the arbitrator's broad discretion and control over the process, it is difficult for the Court to predict the timing of the arbitration with any certainty.

Footnote 7:The issue of Curia potentially disabling itself from performing its alleged obligations under the MSA and Work Orders by entering into new commercial agreements with other drug developers was the subject of extensive discussion at the TRO hearing, and that concern was the basis for entry of the TRO.

Footnote 8:Even if Curia manufactured the Product to commercial standards in an FDA-approved facility, the Product could not be distributed commercially until the NDA is approved.

Footnote 9:The MSA defines "Curia-specific portions" as "those sections of the regulatory applications, amendments or correspondence that reference Curia's systems, documentation, facilities or capabilities" (id.).

Footnote 10:A premature FDA inspection of the Camarillo Facility could have caused substantial harm to Curia (see Alexander Aff., ¶¶ 19-21; Woltering Aff., ¶¶ 11-12). However, the FDA did not attempt to inspect the Camarillo Facility based on the disputed filing, and it appears unlikely that the filing could have triggered an unannounced inspection (see NYSCEF Doc No. 70).