Cyprium Therapeutics, Inc. v Curia Global, Inc. (2022 NY Slip Op
51426(U))

[*1]

Cyprium Therapeutics, Inc. v Curia Global, Inc.

2022 NY Slip Op 51426(U) [81 Misc 3d 1238(A)]

Decided on September 12, 2022

Supreme Court, Albany County

Platkin, J.

Published by New York State Law Reporting
Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be
published in the printed Official Reports.

Decided on September 12, 2022
Supreme Court, Albany County

Cyprium
Therapeutics, Inc., Petitioner,

against
Curia Global, Inc., Respondent.

Index No. 905902-22

DLA Piper LLP (US)
Attorneys for Petitioner
(Brett Ingerman, of
counsel)
6225 Smith Avenue
Baltimore, Maryland 21209
and
(Steven M. Rosato, of counsel)
1251 Avenue of the Americas
New
York, New York 10020
Nixon Peabody LLP
Attorneys for Respondent
(Daniel J. Hurteau, of
counsel)
677 Broadway, 10th Floor
Albany, New York 12207
and
(Richard H. Tilghman IV and Kathleen Mallon, of counsel)
70
W. Madison St., Suite 5200
Chicago, Illinois 60602

Richard M. Platkin, J.

Petitioner Cyprium Therapeutics, Inc. ("Cyprium") brings this special proceeding
under [*2]CPLR 7502 (c), seeking a preliminary
injunction in aid of arbitration. Respondent Curia Global, Inc. ("Curia") opposes the
application and cross-moves for an order compelling arbitration and staying this
proceeding.
BACKGROUND
"Cyprium is
biotechnology company that develops novel therapies for Menkes disease" (NYSCEF
Doc No. 1 ["Petition"], ¶ 36). Menkes disease is "a severe childhood disease that
prevents the body from properly metabolizing copper. [It] may affect up to 250 newborns
annually in the United States alone and causes serious developmental and neurological
symptoms, including significant brain and nervous system damage, lack of normal
growth, and severe abnormalities in the child's physiological development" (id.,
¶ 6; see generally NYSCEF Doc No. 68 ["Kaler Aff."]). "Infants born with
[Menkes] disease, if untreated, presently have a median survival rate of just 16
months. There are currently no FDA approved treatments for this disease"
(Petition, ¶ 6).
"Curia is a global contract research, development and manufacturing organization
that assists biotechnology companies in the development and manufacturing of drug
therapies" (id., ¶ 37). "Curia's predecessor in interest, Integrity Bio, Inc.,
served as Cyprium's contract manufacturing organization ('CMO') beginning in 2017 out
of its Camarillo, California facility (the 'Camarillo Facility')" (id., ¶ 9).
Following Curia's acquisition of Integrity Bio, the Camarillo Facility has been operated
by Curia Bio California, Inc. ("Curia Bio"), a subsidiary of Curia (see id.;
NYSCEF Doc No. 15 ["Parikh Aff."], ¶ 7).
For more than three decades, Stephen G. Kaler, M.D., M.P.H. has been working to
treat infants with Menkes disease through the administration of Copper Histidinate
(see Kaler Aff., ¶¶ 4-5). The new drug that Cyprium seeks to bring to
market, CUTX-101 ("the Product"), is a formulation of Copper Histidinate administered
through a daily "subcutaneous injection, . . . for three or more years" (Petition,
¶¶ 1, 7). "Remarkably, Cyprium's clinical studies to date suggest that the
Product may increase the median survival rate to nearly 15 years in
treated newborns" (id.).
Integrity Bio "successfully served as Cyprium's CMO through the beginning stages
of the Product's development and clinical trials and ultimately was acquired by Curia in
August 2021. In total, Cyprium has paid to Integrity Bio/Curia nearly $5.5 million for its
CMO services" (id., ¶ 41).
Following pre-clinical testing and Phase I, II, and III clinical trials, Cyprium initiated
a rolling submission of a new drug application ("NDA") for the Product to the United
States Food and Drug Administration ("FDA") (see id., ¶ 44). The Product
was "eligible for rolling submission of the NDA due to the Fast Track and Breakthrough
Therapy designations given to it by the FDA. As a result, Cyprium can submit sections of
the NDA for review and approval by the FDA as they are completed" (id.; see
id., ¶¶ 10-11).
Pursuant to a Master Services Agreement dated December 9, 2021 (see
Petition, Ex. 1 ["MSA"]), Cyprium engaged Curia to provide "process development and
manufacturing services in connection with the NDA for the Product" (id., ¶
47). The particular services to be rendered by Curia shall be set forth in work orders,
which "allows the parties to contract for multiple [s]ervices . . . without having to
re-negotiate the basic terms and conditions" of the MSA (¶ 2 [a]).
At issue herein are the two work orders dated February 23, 2022 (see
Petition, Exs. 2-3 [*3]["Work Orders"]). Under the
Work Orders, Curia agreed to manufacture two batches of the Product at the Camarillo
Facility "to demonstrate that the manufacturing facility modifications produce a product
of equivalent or better quality than . . . batches produced pre-modification" (Work
Orders, § 1). The Work Orders explicitly call for the batches to "be manufactured
using commercial production standards" (id.). And due to the use of commercial
production standards, Curia charged Cyprium almost double the price of prior clinical
batches (see Petition, ¶ 54; Parikh Aff., ¶ 19).
The Camarillo Facility historically "has made only clinical batches of drug product
for its customers, meaning batches to be used for clinical trials" (Parikh Aff., ¶ 9).
But to obtain approval of the NDA, "either Cyprium or Sentynl will need a commercial
manufacturer. Curia Bio has been anticipating the possibility of becoming the
commercial manufacturer for Copper Histidinate for several years . . ." (id.,
¶ 9).[FN1]

For this reason, "[t]he Camarillo facility has been making upgrades over the past few
years to prepare itself to be a commercial manufacturer" (NYSCEF Doc No. 17
["Alexander Aff."], ¶ 15) and "for an eventual Pre-Approval Inspection ('PAI') by
the [FDA], which . . . is part of the NDA process" (NYSCEF Doc No. 18 ["Finnley
Aff."], ¶ 9). Thus, the successful production of new batches would confirm "that
the facility modifications did not adversely affect the production of Copper Histidinate"
(Parikh Aff., ¶ 16).
On April 7, 2022, Curia invoiced Cyprium for the Work Orders (see
NYSCEF Doc Nos. 25-26 ["Invoices"]). The Invoices included fees for the
manufacturing work, as well as Curia's project management services (see id.;
Work Orders, § 7.1; see also Finnley Aff., ¶ 22).
The MSA required Cyprium to make an upfront payment of 30% of the overall value
of the Work Orders (see MSA, ¶ 6 [b]; Work Orders, § 7.2) and "pay
each invoice . . . within thirty (30) days of the date such invoice is sent" (MSA, ¶ 6
[c]). However, "[i]f any portion of an invoice is disputed in good faith, [Cyprium] will
pay the undisputed amounts and promptly notify Curia in writing of the nature of the
dispute, whereupon the parties will use good faith efforts to reconcile the disputed
amount as soon as practicable" (id.). 
Cyprium alleges that, around the time the Invoices were issued, Curia began delaying
production of the new batches (see Petition, ¶ 55). "On March 30, 2022,
Curia informed Cyprium of an issue with the raw materials testing and release and, a
week later on April 5, 2022, Curia pushed the target manufacturing dates back to April
18 and 25. Then, Curia informed Cyprium that a second unspecified quality-assurance
issue arose on or about April 11, 2022, and Curia pushed the target manufacturing dates
back again to April 25 and May 2, 2022. Curia informed Cyprium of a third purported
quality-assurance issue that supposedly had arisen on or about April 18, 2022 and again
extended the target manufacturing dates to May 2 and 9, 2022" (id., ¶
56).
On April 20, 2022, Cyprium's counsel wrote to Curia in connection with a dispute
concerning the testing regimen for the new batches (see NYSCEF Doc No. 46).
That dispute ultimately implicated a long-festering dispute that preceded the signing of
the Work Orders: whether Curia would be manufacturing "commercial batches" of the
Product, as requested by Cyprium, or producing clinical batches "using commercial
production standards," as Curia [*4]insisted (see
NYSCEF Doc Nos. 24, 51). On April 26, 2022, Cyprium was informed that there was an
out-of-specification test result that would further delay manufacturing of the Product
(see NYSCEF Doc No. 46). 
At Cyprium's request, a teleconference was held on April 29, 2022. Cyprium claims
that no one from Curia "could provide a meaningful explanation for the delays" or for
Curia's position that it was not obliged to test the confirmation batches in accordance
with FDA regulations governing Good Manufacturing Practices ("GMP") and
commercial production standards (Petition, ¶ 61). "Given Curia's apparent inability
and unwillingness to deliver the manufacturing services that it promised under the
February 23 Work Orders, Cyprium made clear during the April 29th teleconference that
no payment on the Disputed Invoices would be forthcoming until the parties' issues were
resolved" (id., ¶ 62).
"Curia concluded the April 29th teleconference by assuring Cyprium that it would
meet internally to discuss the disputes and would be in touch shortly with a proposed
solution. Instead, the next communication that the parties had regarding this ongoing
dispute was Curia's June 9, 2022 Termination Letter. Curia never once inquired or
followed up about any invoices that it claimed in that letter to have been delinquent"
(id., ¶ 63 [citation omitted]).
Curia presents a very different version of events. Curia asserts that Cyprium raised
no objection when the Invoices were presented (see NYSCEF Doc Nos. 34-35),
and it heard nothing further about the Invoices until after termination of the MSA and
Work Orders on June 9, 2022 (see Finnley Aff., ¶¶ 22-24). According
to Curia, Cyprium never disputed that the initial 30% deposit and project management
fees were owed prior to termination (see id.; Parikh Aff., ¶¶ 25-28).
And despite detailed meeting minutes and project notes, Curia has no record of Cyprium
raising a payment dispute during the April 29, 2022 teleconference (see Finnley
Aff., ¶¶ 23-24, 27; Parikh Aff., ¶¶ 27-28).
"On June 9, 2022, with deposit fees over three months in arrears, invoices for project
management fees that remained unpaid, and strong suspicions that Cyprium had
wrongfully made regulatory filings without involving Curia, Curia decided that its only
viable option was to terminate the [Work Orders] and MSA" (Parikh Aff., ¶ 30;
see NYSCEF Doc No. 27 ["Termination Letter"]).
Curia's letter states that the termination was made under Section 18 (b) (i) of the
MSA, which permits a party to terminate for material breach "effective upon [45] days
prior written notice" if the other party does not cure the breach; "provided, however, that
failure by [Cyprium] to pay undisputed amounts due . . . within [15] days after such
payments are due shall constitute cause for immediate termination." 
Additionally, the Termination Letter states, "[u]pon information and belief, [that]
Cyprium breached the MSA's terms some time in February 2022 by filing an updated
version of Module 3 of [the NDA] and Investigational New Drug Application ('IND')
with the [FDA] over Curia's written objections." Under the MSA, Cyprium agreed to
"make available to Curia the Curia-specific portions of all regulatory [filings] and all
correspondence with a regulatory authority . . . relating to the Product," to incorporate all
changes provided by Curia that "correct for factual inaccuracies," and "to reasonably
consider all other comments" (MSA, ¶ 10 [e]).
In this regard, the Termination Letter refers to a February 18, 2022 communication
from Cyprium advising Curia that, "in the forthcoming filings, [the Camarillo Facility]
would no longer be classified as a clinical site, but as a commercial site for the
manufacture of [the Product]" (Termination Letter, p. 2). Despite Cyprium stating that it
would make this filing [*5]against the advice of Curia's
regulatory personnel, "Curia was never provided a draft of the amended filing, nor an
opportunity to comment or correct the factual inaccuracy that Curia was prepared to
commence commercial manufacturing" (id.). 
Cyprium responded to the Termination Letter by taking the position that the Invoices
were disputed, and it had 45 days to cure any breach concerning the regulatory filings
(see NYSCEF Doc No. 37). However, Curia declined to rescind the termination
(see NYSCEF Doc No. 38). The parties then discussed possible business
solutions but were unable to reach agreement (see Petition, ¶ 73; see
also NYSCEF Doc Nos. 41-44).
Cyprium also attempted to cure any breach concerning the regulatory filing and
requested Curia's input (see NYSCEF Doc No. 28). Curia instructed Cyprium
that, because its manufacturing work was clinical rather commercial, it was not
appropriate to list Curia Bio in the Form 356h or to list the Camarillo Facility as ready
for a PAI; instead, Curia directed Cyprium to identify the facility status as "withdrawn"
(id.). However, after speaking to someone at the FDA, Cyprium changed the
manufacturing site status to "TBD" (id.).
Cyprium commenced this proceeding on August 4, 2022 through the electronic filing
of the Petition, supporting papers and a proposed Order to Show Cause for a preliminary
injunction requiring Curia to perform its obligations under the MSA and the Work
Orders during the pendency of the arbitration (see NYSCEF Doc No. 8). The
proposed Order to Show Cause included a temporary restraining order staying Curia's
termination of the MSA (see id.).
Following a hearing held on August 5, 2022 and continued on August 8, 2022
(see NYSCEF Doc Nos. 63-64), the Court signed the Order to Show Cause
bringing on the injunction application (see NYSCEF Doc No. 12 ["OTSC"]). The
Court denied Cyprium's request for a TRO staying termination of the MSA, but it did
order Curia to provide Cyprium with:
at least 72 hours prior written notice before taking any action that may
prevent it from performing its alleged obligations under the MSA if directed to do so by
the Court, including the alleged obligations to (i) manufacture the Product called for
under the February 23 Work Orders and (ii) support Cyprium's [NDA] for the Product
pending before the [FDA]. To the extent that Cyprium believes that the contemplated
action(s) disclosed by Curia would interfere with Curia's ability to perform under the
requested preliminary injunction, Cyprium retains the right to seek appropriate temporary
relief from the Court (id.).
Curia opposes the preliminary
injunction motion and cross-moves for an order compelling Cyprium to arbitrate and
staying this proceeding pending arbitration (see NYSCEF Doc No. 61). Oral
argument was held on August 24, 2022, a copy of the hearing transcript was filed on
August 30, 2022 (see NYSCEF Doc No. 79 ["Transcript"]), and this expedited
Decision & Order follows.
I. CURIA'S CROSS MOTION TO
STAY/COMPEL
The Court begins with Curia's cross motion to compel
Cyprium to arbitrate its application for preliminary injunctive relief and to stay this
proceeding during the pendency of the [*6]arbitration.[FN2]
 Curia argues that the Federal Arbitration Act ("FAA") requires the arbitrator to decide
all issues of arbitrability and supplants inconsistent provisions of state law, including
CPLR 7502 (c) (see NYSCEF Doc No. 62 ["XMOL"], p. 2). Curia further
contends that the MSA's broad arbitration clause (see MSA, ¶ 20 [d])
evinces the parties' intention to arbitrate "any and all disputes," including disputes
concerning interim injunctive relief (XMOL, p. 2).
In executing the MSA, the parties agreed that "[a]ll disputes arising from or related
to" the MSA "shall be submitted to arbitration before a single arbitrator, administered by
the American Arbitration Association (AAA) in Albany, New York . . . under the
Commercial Arbitration Rules" (MSA, ¶ 20 [d]). "The arbitrator shall have
exclusive authority to resolve any dispute relating to the interpretation, applicability,
enforceability, or formation of the agreement to arbitrate . . ." (id.). The MSA
"and all actions, causes of action, or claims of any kind that may be based upon, arise out
of, or relate to [it], or the negotiation, execution, or performance of [the MSA], shall be
governed by, interpreted under, and construed in accordance with the laws of State of
New York, without regard to the principles of conflicts of law" (id.). 
As Cyprium observes, the power of courts to issue an injunction in aid of arbitration
is well recognized both under the FAA and CPLR 7502 (c). Under the FAA, the "Second
Circuit has repeatedly held that courts retain the power, and the responsibility, to
consider applications for preliminary injunctions while a dispute is being arbitrated"
(General Mills, Inc. v Champion Petfoods United States, Inc., 2020 WL 915824,
*3, 2020 US Dist LEXIS 32924, *7-8 [SD NY, Feb. 26, 2020, No. 20-CV-181 (KMK)]
[collecting cases]). The duty of the federal district courts to "consider the merits of a
requested preliminary injunction even where the validity of the underlying claims will be
determined in arbitration" is not "affected by the pro-arbitration policy manifested in the
FAA" (American Exppress Fin. Advisors v Thorley, 147 F3d 229, 231
[1998]).
CPLR 7502 (c) was enacted by the New York State Legislature for the purpose of
"equat[ing] the relief available in state court with that available in federal court" (SG
Cowen Sec. Corp. v Messih, 224 F3d 79, 83 [2d Cir 2000]). As such, the New York
courts will, in proper cases, grant "judicial injunctions in aid of arbitration, in keeping
with the [FAA]" (Cell Tower
Lease Acquisition, LLC v Rego Park N.H. Ltd., 144 AD3d 453, 453 [1st Dept
2016]; see Matter of Rockwood
Pigments NA, Inc. v Elementis Chromium LP, 124 AD3d 509, 510-511 [1st
Dept 2015] [granting injunction in aid of arbitration where parties agreed "that all
disputes arising out of or relating to the agreement . . . shall be submitted to
arbitration"]).
And contrary to Curia's contention, there is nothing in the MSA evincing the parties'
intention to foreclose Cyprium from exercising its "extant, independent legal right" to
pursue an injunction in aid of arbitration under CPLR 7502 (c) (General Mills,
2020 WL 915824, *6; 2020 US Dist LEXIS 32924, *16). This is not a case like Matter of Diamond Waterproofing
Sys., Inc. v 55 Liberty Owners Corp. (4 NY3d 247, 252-253 [2005]), where the
issue was whether the contracting parties had affirmatively demonstrated their intention
to displace the default rule under the FAA and have the court, rather than the arbitrator,
decide the threshold question of timeliness. The parties here contracted to apply New
York law in a legal landscape in which CPLR 7502 (c) consistently has been interpreted
to allow injunctions in aid of arbitration. If the [*7]parties
intended to foreclose the usual application of CPLR 7502 (c), it was incumbent upon
them to express that intention in the MSA through clear language.[FN3]

Nor does the parties' selection of the Commercial Arbitration Rules of the AAA,
which permit the arbitrator to grant "interim measures" and "emergency measures of
protection," deprive this Court of jurisdiction to grant an injunction in aid of arbitration
under CPLR 7502 (c). In fact, the Commercial Arbitration Rules expressly recognize that
"[a] request for interim measures addressed by a party to a judicial authority shall not be
deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate"
(Rule 38 [c]; accord Rule 39 [h]; see also Next Step Med. Co., Inc. v Johnson
& Johnson Intern., 619 F3d 67, 70 [1st Cir 2010]).
Based on the foregoing, the cross motion is denied.
II. CYPRIUM'S MOTION FOR
PRELIMINARY INJUNCTION
Under CPLR 7502 (c), a court
may grant a preliminary injunction in connection with a pending arbitration "upon the
ground that the award to which the applicant may be entitled may be rendered ineffectual
without such provisional relief." The movant "must also demonstrate a probability of
success on the merits, danger of irreparable injury in the absence of a preliminary
injunction, and a balance of the equities in [its] favor" (Matter of Patrolmen's Benevolent
Assn. of the City of NY, Inc. v City of New York, 112 AD3d 116, 118 [1st Dept
2013]; see SG Cowen, 224 F3d at 84).
A. Ineffectualness / Irreparable Harm [FN4]
A movant for a preliminary injunction must establish that it is likely to suffer
irreparable harm absent the requested relief. Of the traditional equitable criteria for an
injunction, "a showing of probable irreparable harm is the single most important
prerequisite" (Reuters Ltd. v United Press Intl., Inc., 903 F2d 904, 907 [2d Cir
1990] [internal quotation marks and citations omitted]). Irreparable harm means an injury
for which a monetary award alone cannot be adequate compensation (see Town of Liberty Volunteer
Ambulance Corp. v Catskill Regional Med. Ctr., 30 AD3d 739, 740 [3d Dept
2006]).
Coupled with the ineffectualness requirement of CPLR 7502 (c), Cyprium has the
burden of establishing that a preliminary injunction is necessary to (1) avert imminent
and irreparable harm, and (2) prevent an eventual arbitral award in its favor from being
rendered ineffectual.
Cyprium maintains that a preliminary injunction is needed to avoid irreparable harm
to [*8](1) infants suffering from Menkes disease, (2) the
NDA, and (3) Cyprium's ability to continue as a going concern to see the NDA through
to fruition.
The chain of harms alleged by Cyprium begins with the fact that Curia is the only
manufacturer of the Product (see Petition, ¶ 34).[FN5]
Cyprium contends that it would take 12 to 18 months to transition to a new CMO capable
of manufacturing the Product in accordance with current GMP ("cGMP") (see
id., ¶¶ 9, 33-34, 82). This delay in bringing a new CMO on board and
transferring Curia's manufacturing technology would delay approval of the NDA by
several years, according to Cyprium (see id., ¶ 81).
In the meantime, babies and infants with Menkes disease are receiving clinical doses
of the Product, but Cyprium will "run out of Product . . . no later than the fall of 2023"
(id., ¶ 82). "It is therefore certain that there will be a substantial gap in the
availability of the Product absent immediate court intervention" (id., ¶ 83).
Additionally, given the success of the clinical trials, Cyprium "continues to receive
requests from additional children suffering from Menkes disease (including, for example,
requests from at least 10 children in . . . June 2022)" (id., ¶ 33). 
In the longer term, Cyprium emphasizes the irreparable harm to the "additional
dozens or hundreds" of children with Menkes disease who would benefit from treatment
with the Product following FDA approval (id., ¶ 81). In addition to
allowing the Product to be distributed to all children suffering from Menkes disease,
FDA approval would raise awareness of the disease and promote newborn screening
(see id.).
Cyprium recognizes that approval of the NDA is not guaranteed, but it emphasizes
that the Product has proven safe and effective in pre-clinical testing and Phase I, II and
III clinical trials (see id., ¶¶ 10, 44), and the FDA granted
"Breakthrough Therapy, Fast-Track, Rare Pediatric Disease and Orphan Drug"
designations to the Product (id., ¶ 11), thereby making it eligible for a
fast-tracked NDA process (see id., ¶ 44). Together with the absence of any
other treatment for a fatal illness afflicting babies and infants (see id., ¶ 43),
Cyprium believes it highly likely that the FDA will approve the NDA if the parties
continue to work together to fulfill the Work Orders.
On the other hand, Cyprium contends that if Curia's termination is allowed to stand,
approval of the NDA will be delayed by several years, and there are serious doubts as to
whether the company can continue as a going concern through this period of extended
delay. 
Cyprium explains that its business is premised entirely on the development and
commercialization of the Product (see id., ¶ 8). It is a small company with
limited financial resources, and timely FDA approval of the NDA "is essential to
Cyprium's continued existence" (id., ¶ 32). "Cyprium has limited cash on
hand, and existing capital commitments are all tethered to timely approval of the NDA by
the FDA" (id., ¶ 87). And delays in the NDA process will hamper
Cyprium's ability to attract additional capital, which would require the company "to lay
off employees, curtail research and development activities, and potentially close its doors
altogether, before the Product ever can be distributed widely to those suffering from
Menkes disease" (id., ¶ 86).
In other words, "Cyprium's funding will quickly dry up unless Curia's unlawful [*9]termination of the MSA is reversed and its obligations
under the other incorporated agreements are reinstated" (id., ¶ 88).
The same claims of irreparable harm underlie Cyprium's contention that an eventual
arbitral award in its favor would be ineffectual absent a preliminary injunction. Cyprium
expects that it would take about one year for a final award to be rendered, and in the
meantime there will be a shortage of clinical doses for current patients, Cyprium will be
forced to start the long and expensive process of transitioning to a new CMO, the FDA's
consideration of the NDA will be delayed by several years, and Cyprium is unlikely to
remain in business long enough to see the NDA through to a successful conclusion.
In its answering papers, Curia argues principally that Cyprium's claims of irreparable
harm and ineffectualness are speculative and inadequately supported. Curia further
indicates its willingness to expedite the arbitral process, with the hope that an award
could be rendered within six (6) months (see NYSCEF Doc No. 14 ["Opp
Mem"], pp. 14-15).[FN6]

As to Cyprium's concerns for its clinical patients, Curia asserts that there are 6,685
vials of the Product in inventory at the Camarillo Facility, Cyprium has not requested
shipments of the Product from Curia since May 2022, and Cyprium has used an average
of only about 4,300 vials per year (see Finnley Aff., ¶ 30). Curia further
argues that if the existing clinical supply proves insufficient, Cyprium is free to seek
interim relief before the arbitrator.
As observed by Cyprium in reply, however, the vial numbers cited by Curia appear
to be outdated and not reflective of current usage levels (see NYSCEF Doc No.
66 ["Rosenwald Aff."], ¶¶ 23-24). According to Dr. Lindsey Rosenwald,
Cyprium's executive chairman and a licensed physician:
The historical inventory usage levels that Curia cites are outdated and do
not account for recent developments that have increased awareness of [the Product] in
both the medical and patient communities. Over the last year, Cyprium has seen a marked
increase in compassionate-use requests for new patients . . . . For example, Cyprium
received ten new requests in June of this year alone; this is compared to seven patients
who initiated treatment in 2021. As a result, Cyprium's inventory usage levels have
increased approximately 64% on an annual basis over the last 12 months. If those usage
levels hold, Cyprium is projected to run out of inventory to supply to patients by no
later than March [2023] without any additional manufacturing (id., ¶ 24
[emphasis added]).
Relatedly, Dr. Rosenwald points out that "much of
the additional inventory held by Curia consists of single-use vials, as opposed to the
multi-use vials that Curia previously had manufactured and were used in patients. As a
result, Curia's reliance on Cyprium's historical usage of multi-use vials to project how
long the single-use vials will last is an apples-and-oranges comparison" (id.,
¶ 25; see id., ¶ 26). Limited to its current inventory, Cyprium will be
unable to enroll new patients after December 2022, and it cannot guarantee that current
patients will be able to complete their treatment (see id., ¶ 27).
Further, Curia's argument that Cyprium could pursue interim relief before the
arbitrator if the existing clinical supply proves insufficient elides over the real risk that
Curia may, during the pendency of the arbitration, enter into commercial agreements with
other drug companies that leave it without the capacity to manufacture additional Product
(see id., ¶¶ 20-21, 29).[FN7]
And while Cyprium may be entitled to pursue interim relief under the Commercial
Arbitration Rules, the availability of an alternative forum does not negate its showing of
irreparable harm here.
Next, Curia argues that Cyprium has not presented evidence of any efforts to secure
a different CMO. Curia observes that the Cyprium/Sentynl agreement gave Sentynl the
right to qualify additional CMOs in parallel with Cyprium's development of the Product
(see NYSCEF Doc No. 31, § 5.7 & Schedule 2.1.5, ¶ 6). Curia
also submits evidence that it referred Cyprium to several other CMOs "that may be an
appropriate fit for Cyprium's project" (NYSCEF Doc No. 42).
Cyprium responds that it "already has contacted multiple different manufacturers
over the last two months but has to date been able to find only two manufacturers that
currently appear willing and reasonably capable of manufacturing [the Product]. Even
then, in the event that Cyprium is eventually able to identify a suitable replacement
manufacturer, it is still anticipated that a technology transfer . . . would take around 15
months . . . a timeframe corroborated by Curia itself in an offer to arrange for a tech
transfer to one of its other facilities" (Rosenwald Aff., ¶ 21; see also id.,
¶ 33). And while Curia claims that "other manufacturers would be able to move
more quickly" in producing the Product (Opp Mem, p. 15), it has not adduced any
admissible evidence to support this claim.
Curia further argues that harms predicated upon the FDA's approval of the NDA are
speculative, as it is unknown whether and when such approval may issue (see id.
["future demand (for the Product) is subject to an uncertain regulatory determination
outside of the parties' and the arbitrator's control"]). Cyprium acknowledges that approval
of the NDA is no sure thing, but insists that the Product is on the "cusp" of FDA
approval and estimates a likelihood of greater than 90% in light of the successful clinical
trials, the FDA's special designations of the Product, and the lack of any alternative
treatment for Menkes disease (see Rosenwald Aff., ¶ 35; NYSCEF Doc No.
67, p. 14).
Curia further complains that the record does not include any specifics regarding
Cyprium's funding sources or available capital. Curia observes that Cyprium is owned by
"Fortress Biotech, a publicly traded company worth over $125 million" (Opp Mem, p.
22). Cyprium responds, through its executive chairman, that a "delay of months or years
in the NDA submission process would be a death knell for Cyprium. Cyprium has limited
access to capital, and . . . it will be increasingly difficult for Cyprium to raise new
capital," particularly in the current economic climate (Rosenwald Aff., ¶ 30).
Upon due consideration of all of the evidence submitted by the parties, the Court
finds that, absent a preliminary injunction, there will be an insufficient supply of the
Product to treat clinical patients, the NDA for the Product will be substantially delayed,
and Cyprium's ability to continue as a going concern and see the NDA through to fruition
will be severely jeopardized [*10](see Bionpharma
Inc. v CoreRx, Inc., 2022 WL 246742, *6, 2022 US Dist LEXIS 15287, *18 [SD
NY 2022, Jan. 27, 2022, No. 21-cv-10656 (JGK)]). These are harms that cannot be fully
remedied through an eventual award of money damages. The Court further finds that an
arbitral award in Cyprium's favor in one year from now (or even months sooner) would
not be effectual absent an injunction (see Rockwood, 124 AD3d at 511).
B. Likelihood of Success
To obtain a preliminary injunction, Cyprium
also must demonstrate a likelihood of success on the merits. In this context, "likelihood
of success is . . . measured in terms of the likelihood of success in arbitration"
(Cowen, 224 F3d at 84). 
[A]rbitration is frequently marked by great flexibility in procedure, choice
of law, legal and equitable analysis, evidence, and remedy. Success on the merits in
arbitration therefore cannot be predicted with the confidence a court would have in
predicting the merits of a dispute awaiting litigation in court, and it can be expected that
when the merits are in the hands of an arbitrator, this element of the analysis will
naturally have greatly reduced influence (id.).
Cyprium asks the
arbitrator to declare that "Curia had no lawful basis to terminate the MSA under Section
18 (b) (i) based on non-payment of the . . . Invoices because Cyprium placed Curia on
notice, both in writing and verbally, that it was disputing that any amounts were due and
owing on [the Invoices] given the fundamental dispute regarding the nature of the work
to be performed by Curia under the . . . Work Orders" (NYSCEF Doc No. 73, ¶
93). 
Cyprium also seeks a declaration that Curia's termination of the MSA based upon the
February 2022 filing "was unlawful because the information in the Form 356h was
accurate, and, even if it was not, the alleged breach was not material" (id., ¶
94). Additionally, Cyprium claims to have "timely cured any alleged material breach by
filing an updated Form 356h removing any references to Curia or the Camarillo Facility,
as instructed by the FDA" (id.).
1. The Invoices
The MSA obliged Cyprium
to make an upfront payment of 30% (see MSA, ¶ 6 [b]; Work Orders,
§ 7.2) and "pay each invoice issued by Curia within thirty (30) days of the date such
invoice is sent" (MSA, ¶ 6 [c]). However, "[i]f any portion of the invoice is
disputed in good faith, [Cyprium] will pay the undisputed amounts and promptly notify
Curia in writing of the nature of the dispute, whereupon the parties will use good faith
efforts to reconcile the disputed amount as soon as practicable" (id.). 
Cyprium argues that it gave Curia oral and written notice of a fundamental dispute
regarding the services to be rendered under the Work Orders, thus precluding termination
under the safe harbor of Section 6 (c) of the MSA.
Even before the Work Orders were signed, Cyprium and Curia were at odds
regarding the purpose of the new manufacturing work (see NYSCEF Doc No. 19
["Woltering Aff."], ¶ 17). Curia took the firm position that the "intent of the two
confirmation batches is to demonstrate that the manufacturing facility modifications
produce a product of equivalent or better quality than [the] batches produced
pre-modification" (NYSCEF Doc No. 24). "These batches are considered
Confirmatory batches 
NOT Commercial batches" (id.
[emphasis in original]; see [*11]Parikh Aff.
¶¶ 16-22).
Cyprium, on the other hand, insisted that the new batches were "commercial"
because Curia would be manufacturing the Product to commercial standards and
charging "commercial" prices, "regardless of the[] ultimate intended use" for the Product
(NYSCEF Doc No. 51; see Woltering Aff., ¶¶ 19-20; see also
Petition, ¶ 54).[FN8]

It appears that the parties ultimately "papered over" their differences by agreeing on
compromise language that required the production of confirmation batches
"manufactured using commercial production standards" (Work Orders, § 1).
The parties' misalignment spilled over into disputes concerning applicable testing
requirements (see NYSCEF Doc No. 46; see also Petition, ¶¶
57-58). It also appears that Curia experienced several delays in attempting to
manufacture the Product to commercial production standards (see Petition,
¶¶ 55-56), and Curia advised Cyprium on April 26, 2022 that there was an
out-of-specification test result that would further delay production (see NYSCEF
Doc No. 46). 
Cyprium claims that Curia was unable to provide a reasonable explanation for the
delays or for its position that it was not obliged to conduct testing in accordance with
commercial standards (see Petition, ¶ 61). "Given Curia's apparent inability
and unwillingness to deliver the manufacturing services that it promised under the
February 23 Work Orders, Cyprium made clear during the April 29th teleconference that
no payment on the Disputed Invoices would be forthcoming until the parties' issues were
resolved" (id., ¶ 62; see also id., ¶ 18). Cyprium further
observes that "Curia never once inquired or followed up about any invoices that it
claimed in [the Termination Letter] to have been delinquent" (id., ¶ 63
[citation omitted]).
Curia acknowledges that the parties were "not aligned" on the fundamental question
of whether the new batches of the Product "would be designated as commercial or
confirmation batches" (Woltering Aff., ¶ 17). Additionally, there were "numerous
disagreements" about technical and quality control issues (Finnley Aff., ¶¶
14-16), and many of these disputes remained unresolved at the time of the termination
(see id., ¶ 16). However, Curia insists that Cyprium did not provide it notice
of any dispute concerning the Invoices and that it otherwise lacked actual knowledge of
any such dispute.
Anish Parikh, who is responsible for Curia's sales and marketing activities, avers that
he participated in the April 29, 2022 teleconference, and "at no time during that
discussion did Cyprium claim that it was disputing Curia's right to payment on the
confirmation batches that are the subject of the [Work Orders]" (Parikh Aff., ¶ 27).
"If Cyprium had said anything to indicate that it was disputing Curia's right to payment,
Curia would have needed to regroup internally and decide whether to proceed . . . while
an invoice dispute was percolating" (id.).
To similar effect is the affidavit testimony of Mariko Finnley, Curia's director of
program management (see Finnley Aff., ¶¶ 5, 24). "During that
meeting, nothing was said to indicate . . . that Cyprium would not pay its invoices"
(id., ¶ 24). "Had Cyprium told us it would not pay Curia's invoices during
the meeting, that would have been a significant point" (id.).
Cyprium has not adduced any evidence showing that it gave Curia written notice of a
dispute concerning the Invoices. To be sure, the record is replete with communications
[*12]concerning "disputes" between the parties, including
their fundamental disagreement regarding confirmation/commercial batches, disputes
concerning the proper testing regimen, disputes concerning production delays, and
disputes regarding quality issues. But Cyprium has not supplied any writing that disputes
the Invoices, either in their entirety or as to any particular charge. 
There is, however, a sharp factual dispute as to the issues of oral or actual notice (see Latham Land I, LLC v TGI
Friday's, Inc., 96 AD3d 1327, 1328-1329 [3d Dept 2012] [finding substantial
compliance with contractual promise to provide written notice where recipient had actual
notice]; Dellicarri v Hirschfeld, 210 AD2d 584, 585 [3d Dept 1994]; cf.
Ridley Elec. Co., Inc. v
Dormitory Auth. of the State of NY, 152 AD3d 1129, 1132 [3d Dept 2017]
[where prior written notice is a contractual condition precedent to recovery, strict
compliance is required]). The averments of the Petition support a finding of oral or actual
notice (see Petition, ¶¶ 18, 62), whereas the affidavits submitted by
two of Curia's executives present an entirely different version of events (see
Parikh Aff., ¶ 27; Finnley Aff., ¶ 24). 
Curia's version of events appears to be more plausible, given the absence of any
meeting minutes, notes, emails or letters memorializing or responding to the assertion of
a payment dispute by Cyprium.
On the other hand, the April 29, 2022 teleconference occurred at a time when the
parties were bogged down in disputes concerning production delays, disputes concerning
quality issues, disputes over testing requirements, and the over-arching dispute over
confirmation/commercial batches. It certainly is not implausible or unreasonable to
believe that Cyprium indicated during the teleconference that payment on the Invoices
would not be forthcoming until there was a path forward on the Work Orders, even if
financial issues were not the focus of the teleconference. And regardless of what was or
was not said, Curia obviously was aware of disputes permeating almost every aspect of
the Work Orders; as such, Curia may have had actual knowledge that its right to be paid
for the disputed work also was disputed.
Under the circumstances, the Court concludes that Cyprium has demonstrated a fair,
but not overwhelming, likelihood of prevailing before the arbitrator on its challenge to
Curia's termination of the MSA for non-payment of the Invoices.
2. Regulatory Correspondence
In the
Termination Letter, Curia further asserted that Cyprium breached Section 10 of the MSA
"some time in February 2022 by filing an updated version of [Form 356h] with the
[FDA] over Curia's written objection. Cyprium did so without providing drafts of the
document[] to Curia for its review and comment prior to filing" (Termination Letter, p.
1).
Section 18 (b) (i) allows a party to terminate the MSA "effective upon [45] days
prior written notice to the other party, if the other party commits a material breach . . .
and fails to cure such breach by the end of such [45] day period . . . ." And under Section
10 (e), captioned "Regulatory Correspondence," Cyprium "shall make available to Curia
the Curia-specific portions of all regulatory applications and amendments thereto and all
correspondence with a regulatory authority, in each case relating to the
Product."[FN9]
Cyprium "agree[d] to incorporate all [*13]changes
provided by Curia which correct for factual inaccuracies and to reasonably consider all
other comments" (id.).
Initially, Cyprium contends that its February 2022 filing did not identify the
Camarillo Facility as a commercial site (see NYSCEF Doc No. 9 ["MOL"], p.
16). But, as Curia observes, the Form 356h is used for "applications that seek approval
for commercial manufacturing and distribution" (Woltering Aff., ¶ 28).
Cyprium further argues that the Camarillo Facility was ready for FDA inspection,
citing the fact Curia allowed an inspection by the California Department of Public Health
("CDPH") in April 2022 (see MOL p. 17). However, Curia convincingly
responds that Cyprium's "comparison is completely inapt. A PAI inspection . . . focuses
on quality assurance and cGMP adherence, seeking to identify any issues with the
production of a specific drug product. By comparison, a CDPH inspection is more
generalized and focuses on whether the facility has appropriate documentation in place
and [complies] with state-level licensing requirements" (Alexander Aff., ¶ 22;
see Woltering Aff., ¶¶ 9-10; NYSCEF Doc No. 16, ¶ 17). And
even if the February 2022 filing was factually accurate, it was not made available to
Curia.
Cyprium is on stronger ground, however, with the argument that it had 45 days to
cure any material breach of the MSA. Curia implicitly concedes that the June 9, 2022
Termination Letter was the first written notice given to Cyprium of the alleged breach of
Section 10 (see Opp Mem, p. 20 ["the 45-day cure period lapsed with no further
action"]).
Following receipt of the Termination Letter, Cyprium sought Curia's input on a cure
(see NYSCEF Doc No. 28). Curia advised that, since it "will not manufacture for
Cyprium beyond producing product for clinical trials, it is not appropriate to list Curia
within [the Form] 356h" or answer the question regarding the Camarillo Facility's
readiness for inspection (id.). Cyprium responded that it would be removing
Curia's information from Form 356h and inserting "TBD," based on oral advice that
Cyprium obtained from someone at the FDA (id.)
Curia complains that Cyprium's filing did not cure the earlier breach and, in fact,
compounded it. Curia asserts that it never received a copy of the filing, and it was
improper for Cyprium to communicate directly with the FDA (see Woltering
Aff., ¶¶ 24-26). "[I]t would have been better for Cyprium to allow Curia to
tell the FDA itself that the facility was not ready for inspection" (id., ¶
27).
Cyprium's direct communication with the FDA may have been irregular, but Curia
acknowledges that the plain language of Section 10 (e) covers only written
communications (see Opp Mem, pp. 19-20). Further, given that the amended
filing removed any reference to Curia's Camarillo Facility, it is unclear whether Curia
was entitled to receive a copy of the completed filing. And while the "better" approach
certainly would have been for the parties to work in coordination, Curia has not
sufficiently established that Cyprium's approach was violative of the MSA or likely to
cause it harm.[FN10]

Thus, while Curia raises some legitimate questions as to whether Cyprium fully
cured the alleged February 2022 breach(es) of Section 10, the Court finds that Cyprium
is likely to prevail [*14]before the arbitrator on this
issue.
C. Balancing of the Equities
A preliminary injunction in aid of
arbitration is an equitable remedy that only will be granted where the balance of equities
tips in favor of the requested relief. The Court "must weigh the interests of the general
public as well as the interests of the parties to the litigation . . . [and] inquire into whether
the irreparable injury to be sustained is more burdensome [to Cyprium] than the harm
caused to [Curia] through imposition of the injunction" (Eastview Mall, LLC v Grace
Holmes, Inc., 182 AD3d 1057, 1059 [4th Dept 2020] [internal quotation marks,
alterations and citation omitted]).
1. Curia's Contentions
Curia maintains that
it would suffer irreparable harm if "forced to manufacture commercial batches of Copper
Histidinate" (Opp Mem, p. 23). While acknowledging that it worked collaboratively with
Cyprium in July 2022 to develop a plan for doing exactly that, Curia cites: the time and
expense associated with preparing the Camarillo Facility for commercial manufacturing
(see Alexander Aff., ¶¶ 18, 25); the need for Cyprium and Curia to
engage in joint discussions with the FDA regarding "the status of the facility's quality
systems, manufacturing equipment and areas, as well as the additional controls and
mitigation steps that would be taken to adhere to commercial cGMP expectations"
(id., ¶ 24); certain "quality and regulatory" concerns attendant to an
accelerated effort to produce "commercial batches" of Product (id., ¶¶
23, 25); and the risk that the parties' efforts ultimately may prove unsuccessful (see
id., ¶ 25).
Additionally, commercial production would entail dedicating the Camarillo Facility's
lyophilizer — a multi-million dollar piece of equipment — to the Product in
order to avoid the risk of cross-contamination (see id., ¶ 17). Curia's
inability to undertake jobs for other customers using the lyophilizer (and related
equipment) may prevent it from manufacturing other lifesaving and/or life-changing
medications, including potential treatments for prostate cancer, hypothyroidism and
macular degeneration (see Finnley Aff., ¶¶ 6-7).
Finally, Curia argues that the "parties' acrimonious relationship and the need for
close collaboration counsels against an injunction" (Opp Mem, p. 24). While insisting
that Curia "has done its best to work with Cyprium, the parties' relationship has been
fractious" (id., citing Finnley Aff. ¶ 15; Parikh Aff., ¶¶ 17-22;
NYSCEF Doc Nos. 24, 36, 46, 49-50; see Alexander Aff., ¶¶ 23-25).

2. Cyprium's Position
Cyprium again
emphasizes the irreparable harm that will befall Menkes patients, the NDA, and Cyprium
itself if the requested preliminary injunction is not granted. 
Cyprium further argues that Curia will not be prejudiced by an injunction requiring it
to perform under the Work Orders at the agreed-upon price. Cyprium emphasizes that
Curia agreed to manufacture two batches of the Product using commercial production
standards (for which it charged commercial prices), and Curia invested millions of
dollars in the Camarillo Facility to be the commercial manufacturer of the Product
(see Opp Mem, p. 5; Alexander Aff., ¶¶ 15, 17; Finley Aff.,
¶¶ 10-12).
Cyprium disputes Curia's assumption that commercial batches would have to be
manufactured on an overly expedited basis, and it observes that Curia's scope of work
always [*15]contemplated use of the lyophilizer.
As to Curia's claim that the parties' contentious relationship counsels against an
injunction, Cyprium observes that it has worked closely with Curia and Integrity Bio at
the Camarillo Facility for years, and it is confident that the parties would work together
in good faith to implement the terms of any injunction ordered by the Court.
Finally, Cyprium argues that any investments or other expenditures that Curia may
incur in order to perform under the MSA and Work Orders can be quantified and
addressed after the merits of the parties' disputes are resolved by the arbitrator.
Cyprium therefore contends that its interest and the interest of the general public in
seeing an approved treatment for Menkes disease outweigh the potential harms cited by
Curia.
3. Analysis
Upon weighing the relevant
public and private interests, the Court finds that the irreparable injuries that are likely to
be sustained absent an injunction outweigh the potential harms that Curia may suffer
through imposition of an injunction.
Many of the harms identified by Curia can be quantified and compensated through
an eventual award of money damages, and Cyprium will be required to post an
undertaking in an amount sufficient to secure Curia's costs and damages if it ultimately is
determined that Cyprium was not entitled to the preliminary injunction (see
CPLR 6312 [b]; Part II [D], infra). 
As to the non-monetary harms identified by Curia, including quality and regulatory
concerns (see Finnley Aff., ¶¶ 23, 25), the Court finds that Curia
assumed certain of these risks in assenting to the MSA and the Work Orders, and other
risks can be mitigated through careful management. Indeed, as recently as July 2022,
Curia developed a plan to manufacture commercial batches of the Product at the
Camarillo Facility by year end (see Alexander Aff., ¶¶ 22-25), though
that plan ultimately was rejected by Cyprium (see id., ¶ 26).
Moreover, Curia did agree to manufacture batches of Product at the Camarillo
Facility using "commercial production standards" (Work Orders, § 1), Curia "has
been anticipating the possibility of becoming a commercial manufacturer of Copper
Histidinate for several years and has entered into an agreement to make one batch of the
[P]roduct for Sentynl" (Parikh Aff., ¶ 9), and Curia invested millions of dollars to
ready the Camarillo Facility for commercial manufacturing (see Alexander Aff.,
¶¶ 15, 18, 24; Woltering Aff., ¶¶ 14-15).
Regarding the public interest, Cyprium makes a persuasive case that it is likely to
obtain approval of the NDA and bring a safe and effective treatment for Menkes disease
to market. And while dedicating the Camarillo Facility's lyophilizer to commercial
manufacture of the Product may leave Curia Bio unable to manufacture other important
new drugs, these potential harms are largely speculative at this point.
Accordingly, while both parties work to save and improve lives by developing and
manufacturing innovative drug therapies, the public interest weighs strongly in favor of
Cyprium's effort to bring the Product to market expeditiously.
Based on the foregoing, the Court is satisfied that the balance of equities tips in favor
of granting an injunction in aid of arbitration (see Bionpharma, 2022 WL
246742, *8-9, 2022 US Dist LEXIS 15287, *25-27).
D. Form of the Injunction
Having concluded that a preliminary
injunction is necessary to prevent an eventual arbitral award from being rendered
ineffectual and that the traditional equitable criteria for [*16]preliminary injunctive relief have been established, the
Court must consider the form of the injunction. 
Cyprium seeks a preliminary injunction "requiring Curia to continue to perform its
obligations under the [MSA], including but not limited to its obligations to . . . : (i)
manufacture two commercial confirmation batches of [the Product], as required under
the Work Orders . . . , which incorporate the terms of the MSA by reference . . . ; and (ii)
support Cyprium's [NDA] for the Product" (OTSC).
This language adopts certain disputed positions taken by Cyprium. Most notably,
Curia maintains that it is not obliged to produce "commercial batches" of the Product, but
the proposed injunction would require Curia to manufacture "commercial confirmation
batches" — a term that does not appear in the MSA or Work Orders and appears
to suggest something other than confirmation batches "manufactured using commercial
production standards" (Work Orders, § 1). And by directing Curia to support the
NDA, the proposed injunction would treat the MSA as incorporating the Quality
Agreement (see Petition, Ex. 5; MSA, ¶ 4 [a]; MOL, p. 7), another point
disputed by Curia (see Opp Mem, p. 6; Transcript, pp. 60-61).
The fundamental object of an injunction in aid of arbitration is to "maintain the
status quo pending the decision of the arbitrator to preserve the efficacy of a potential
arbitral award" (Cove v Rosenblatt, 148 AD2d 411, 412 [2d Dept 1989] [internal
quotation marks, brackets and citation omitted]). Here, "the last actual, peaceable
uncontested status" (North Am. Soccer League, LLC v United States Soccer Fedn.,
Inc., 883 F3d 32, 37 [2d Cir 2018] [internal quotation marks and citations omitted])
was on June 8, 2022, prior to Curia's issuance of the Termination Letter. At that point,
the MSA and Work Orders remained in effect, the Invoices were outstanding, Curia had
not demanded a cure of any alleged material breach, and the parties remained divided on
what it means to manufacture confirmation batches using commercial production
standards.
As such, the Court finds that the injunction requested by Cyprium is mandatory in
nature (see Johnson v Kay, 860 F2d 529, 541 [2d Cir 1988]; Matos v City of New York, 21
AD3d 936, 937 [2d Dept 2005]; see also MOL, pp. 12-13 [recognizing
mandatory character of proposed relief]). For a mandatory injunction, Cyprium would be
obliged to demonstrate a clear likelihood of success (see New York v Actavis
PLC, 787 F3d 638, 650 [2d Cir 2015]), a showing that has not been made as to
non-payment of the Invoices.
The Court also is concerned that a preliminary injunction requiring Curia to perform
under the MSA and Work Orders would encroach on the arbitral process and the parties'
agreement to arbitrate all disputes arising from or related to the MSA. Interpretation and
enforcement of an injunction affirmatively directing contractual performance is likely to
involve the Court in monitoring Curia's work and resolving substantive disputes
concerning the MSA and Work Orders. And all the while, the parties would be entangled
in a parallel arbitral process. Such an injunction would not "aid" the arbitration.
The Court therefore declines to order the form of preliminary injunction requested by
Cyprium. Instead, the Court finds, in the exercise of discretion, that a more limited
injunction is warranted: an injunction that stays Curia's termination of the MSA during
the pendency of the arbitration (see Transcript, pp. 107-108 ["We're only asking
you to stay what we believe to be an unlawful termination. Put the parties back in the
position they were in on June 8th, 2022, with all of the rights and obligations that were
under the MSA, the quality agreement, the work orders"]; see also OTSC
[proposed TRO]).
By staying termination of the MSA while the parties work to resolve their disputes
before the arbitrator in "an efficient and economical" fashion (MSA, ¶ 20 [d]), the
preliminary injunction ordered herein will preserve the status quo and oblige Curia to do
nothing more than what it agreed to in the MSA and Work Orders. And given the more
limited form of injunction, the prospect of it causing substantial harm to Curia is
significantly lessened, thereby tipping the equities even more strongly in favor of
Cyprium.
E. Undertaking
CPLR 6312 (b) requires a party obtaining a
preliminary injunction to "give an undertaking in an amount to be fixed by the court, that
the [movant], if it is finally determined that [it] was not entitled to an injunction, will pay
to the [enjoined party] all damages and costs which may be sustained by reason of the
injunction." The undertaking must be "rationally related to the potential damages
recoverable if the preliminary injunction is later determined to have been unwarranted"
(Matter of Witham v Finance
Invs., Inc., 52 AD3d 403, 404 [1st Dept 2008]).
The present record is not sufficiently developed to allow the Court to fix an
appropriate undertaking (see Transcript, pp. 113-114). Accordingly, the parties
shall confer regarding the submission of additional argument and evidence bearing on an
undertaking, and either: (1) stipulate to the amount of an undertaking; (2) stipulate to a
briefing/submission schedule for the purpose of the Court fixing an undertaking; or (3)
request a conference with the Court if the parties are unable to arrive at an appropriate
stipulation.
CONCLUSION
For all of the foregoing
reasons, it is
ORDERED that Curia's cross motion to compel arbitration and stay this
proceeding pending arbitration is denied; and it is further
ORDERED that Cyprium's motion for an injunction in aid of arbitration
under CPLR 7502 (c) is granted; and it is further
ORDERED that, during the pendency of the arbitral process, Curia's
Termination Letter dated June 9, 2022 is stayed and shall be given no force or effect; and
it is further
ORDERED that, during the pendency of the arbitral process, Curia is
enjoined from terminating the MSA; and it is further
ORDERED that the preliminary injunction set forth in the preceding
paragraphs shall supersede and replace the temporary restraining order set forth in the
OTSC; and it is further
ORDERED that the parties shall confer regarding a process and schedule
for fixing an undertaking and, by September 19, 2022, either: (1) stipulate to the
amount of an undertaking; (2) stipulate to a briefing/submission schedule for the purpose
of the Court fixing an undertaking; or (3) request a conference with the Court if the
parties are unable to arrive at an appropriate stipulation; and finally it is
ORDERED that, upon entry of an order fixing an undertaking and
determination of the pending application to seal certain court records, this proceeding
shall be stayed during the arbitral process, pending further order of Court.
This constitutes the Decision & Order of the Court, the original of which is
being uploaded to NYSCEF for electronic entry by the Albany County Clerk. Upon such
entry, counsel for Cyprium shall promptly serve notice of entry.
Dated: September 12, 2022
Albany, New York
RICHARD PLATKIN
A.J.S.C.
Papers Considered:
NYSCEF Doc Nos. 1,
9-12, 14-56, 61-73, 79.

Footnotes

Footnote 1:Cyprium has an
agreement with Sentynl Therapeutics, Inc. ("Sentynl") to sell its rights in the Product if
Cyprium obtains FDA approval (see NYSCEF Doc No. 31).

Footnote 2:To the extent that Curia
seeks to compel Cyprium to arbitrate the underlying dispute(s), the parties already are
participating in arbitration (see NYSCEF Doc Nos. 72-73).

Footnote 3:The Court recognizes
the arbitrator's broad authority to decide gateway issues of arbitrability under the MSA
(see Basile v Riley, 188
AD3d 1607, 1609 [4th Dept 2020]), but Curia has not identified any cases in which
a court ruled that the arbitrator must determine whether the court may grant an injunction
in aid of arbitration. The Court's research discloses only one such case (see Vertiv
Corp. v SVO Bldg. One, LLC, 2019 WL 1454953, *3, 2019 US Dist LEXIS 56096,
*5 [D Del, Apr. 2, 2019, No. 1:18-cv-01776 (RGA)] ["I am entirely without authority to
resolve whether I have authority to resolve (the) request for a preliminary injunction."],
criticized in General Mills, 2020 WL 915824, *6, 2020 US Dist LEXIS 32924
*17; see also Shubin v Slate Digit., Inc., 2022 WL 168152, *5, 2022 US Dist
LEXIS 9958, *12-14 [SD NY, Jan. 19, 2022, No. 21 Civ. 9464 (PAE) [deciding CPLR
7502 (c) application on the merits even after declaring that the arbitration agreement
delegated issues of arbitrability to the arbitrator]).

Footnote 4:Given that Cyprium's
arguments regarding ineffectualness and irreparable harm are closely related, these two
elements will be discussed together.

Footnote 5:The Petition is verified
by Lung S. Yam, the chief executive officer of Cyprium (see id., p. 26). As such,
the Petition is the equivalent of an affidavit for purposes of the instant motion practice
(see CPLR 105 [u]).

Footnote 6:The parties agreed that
the arbitrator could impose reasonable limits on discovery and the hearing to promote "an
efficient and economical arbitration process" (MSA, ¶ 20 [d]). But given the
arbitrator's broad discretion and control over the process, it is difficult for the Court to
predict the timing of the arbitration with any certainty.

Footnote 7:The issue of Curia
potentially disabling itself from performing its alleged obligations under the MSA and
Work Orders by entering into new commercial agreements with other drug developers
was the subject of extensive discussion at the TRO hearing, and that concern was the
basis for entry of the TRO.

Footnote 8:Even if Curia
manufactured the Product to commercial standards in an FDA-approved facility, the
Product could not be distributed commercially until the NDA is approved.

Footnote 9:The MSA defines
"Curia-specific portions" as "those sections of the regulatory applications, amendments
or correspondence that reference Curia's systems, documentation, facilities or
capabilities" (id.).

Footnote 10:A premature FDA
inspection of the Camarillo Facility could have caused substantial harm to Curia (see
Alexander Aff., ¶¶ 19-21; Woltering Aff., ¶¶ 11-12).
However, the FDA did not attempt to inspect the Camarillo Facility based on the
disputed filing, and it appears unlikely that the filing could have triggered an
unannounced inspection (see NYSCEF Doc No. 70).